UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                      :

XIAOCHUN GAO,
                                        :

                    Plaintiff,            :

                                          :                    19 Civ. 2515 (JPC)

           -v-                       :

                                          :           FINDINGS OF FACT AND

SAVOUR SICHUAN INC., *et al.*,      :           CONCLUSIONS OF LAW

                                          :

                    Defendants.       :

                                          :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

From July 17 through July 19, 2023, the Court conducted a three-day bench trial for

Plaintiff Xiaochun Gao's claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-

219, and the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 190 *et seq.* 650 *et seq.*, against

corporate Defendants Savour Sichuan, Inc. and The Best Sichuan, Inc., as well as individual

Defendants Dongmei Wei, Weimin Hong, Xiaoman Duan, and Jie Fang.[1]  Specifically, Gao asserts

claims for unpaid minimum wage under the FLSA and the NYLL, unpaid overtime under the

FLSA and the NYLL, unpaid spread-of-hours pay under the NYLL, and unfurnished wage

statements under the NYLL.

Having considered the evidence admitted at trial, assessed the credibility of the witnesses,

and applied the relevant law, the Court makes the following findings of fact and conclusions of

law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  As discussed below, the Court

finds in favor of Defendants on Gao's claims under the FLSA and for failure to provide wage

---

[1] "Tr." refers to citations to the trial transcript.  Dkts. 164, 166, 168.  "Exh." refers to the
ten exhibits admitted at trial.  Dkt. 171, Exhs. 1-10.

statements under the NYLL.  The Court additionally concludes that Gao is entitled to judgment against Savour Sichuan, Inc., Wei, and Hong on her minimum wage, overtime, and spread-of hours claims under the NYLL, but finds in favor of The Best Sichuan, Inc., Duan, and Fang with respect to those claims.

## I.  Procedural Background

On March 21, 2019, Xiaochun Gao[2] commenced this lawsuit purportedly as a collective action, alleging FLSA and NYLL violations against the corporate entities operating the two restaurants at which Gao worked, Savour Sichuan, Inc. and La Vie En Szechuan Restaurant Corp. ("La Vie"), as well as against individuals alleged to have owned or managed those restaurants: Yi Zhang, Weimin Hong, Dongmei Wei, Xiaomen Gu, and various "Jane Doe" and "John Doe" Defendants.  Dkt. 1 (original complaint) ¶¶ 6-25.

The case was initially assigned to the Honorable Edgardo Ramos.  In April 2019, Savour Sichuan, Inc. and La Vie answered, Dkt. 12, and a month later they amended their joint Answer to add counterclaims premised on allegations that Gao had stolen money from the restaurants, Dkt. 15 (amended answer including counterclaims for conversion, unjust enrichment, breach of duty of loyalty, and faithless servant), which allegations Gao denied, Dkt. 16.  In December 2019, Gao, with Judge Ramos's leave, Dkt. 21, amended her Complaint, adding a retaliation claim.  Dkt. 27 (first amended complaint) ¶¶ 88-97.  Defendants Savour Sichuan, Inc., La Vie, Zhang, Hong, Wei, and Gu jointly answered.  Dkt. 28.

---

[2] In traditional Chinese notation, an individual's surname appears before her given name. But during the trial, the parties and their attorneys often referred to individuals by their given names first, and that convention is more frequently used in the parties' written submissions.  For the sake of consistency, the Court also refers to the parties by their given names.

In October 2020, the case was reassigned to the undersigned, who referred supervision of general pretrial matters to the Honorable Katharine H. Parker.  Dkt. 45.  In January 2021, Judge Parker granted Gao leave to amend her Complaint a second time to add two defendants, Dkt. 48: (1) The Best Sichuan, Inc., which is described as "the successor of the Savour Restaurant," Dkt. 51 (second amended complaint) ¶ 74, and (2) Jie Fang, who is described as "the owner of The Best Sichuan" and as "co-own[ing] the restaurant with [an] owner from the Savour Restaurant," *id.* ¶ 72.  Gao amended her Complaint for a third and final time in March 2021, replacing Defendant "Xiaomen Gu" with "Xiaoman Duan."  *See* Dkt. 67 (the "operative Complaint" or "Complaint"). The Complaint alleged seven causes of action: (1) failure to pay overtime in violation of the FLSA, *id.* ¶¶ 85-89; (2) failure to pay overtime in violation of the NYLL, *id.* ¶¶ 90-95; (3) failure to make spread-of-hours payments in violation of the NYLL, *id.* ¶¶ 96-97; (4) failure to provide annual wage notices in violation of Section 195(1) the NYLL, *id.* ¶¶ 98-100; (5) failure to provide wage statements in violation of Section 195(3) the NYLL, *id.* ¶¶ 101-103; (6) retaliation in violation of the FLSA, *id.* ¶¶ 104-108; and (7) retaliation in violation of the NYLL, *id.* ¶¶ 109-113.  Savour Sichuan, Inc., The Best Sichuan, Inc., Hong, Wei, Fang, and Duan answered the operative Complaint in three groups.  *See* Dkts. 140 (answer from Hong, Wei, and Savour Sichuan, Inc., asserting that Gao was fired for embezzlement), 141-142 (answer from Fang and The Best Sichuan, Inc.), 144 (answer from Duan, asserting as a counterclaim that she was not involved in Gao's employment, is a retired scientist and professor, and resides in Georgia).  As of the date of this decision, neither La Vie nor Zhang has answered the operative Complaint.

On August 11, 2021, Judge Parker conditionally certified Gao's collective action "for non-managerial employees who worked at Savour Sichuan and La Vie En Szechuan, but not the new business, The Best Sichuan, across the street."  Dkt. 92 (transcript for August 11, 2021 hearing) at

8:17-22.  In April 2022, the parties advised the Court on their availability for trial, Dkt. 129, and

the Court thereafter set a trial-ready date of July 17, 2023 and a final pretrial conference for July

11, 2023, Dkt. 130 ("April 19, 2022 Order").

In February 2023, the Court ordered the parties to submit a letter advising whether they

had waived their right to a trial by jury—given that no party had included a jury demand in its

pleadings, and that no party had filed a separate jury demand under Federal Rule of Civil Procedure

38(b)(1).  Dkt. 133.  In March 2023, the Court determined that the parties had indeed waived their

right to a jury trial and further that the parties had failed to identify any "cause beyond mere

inadvertence" permitting the Court under Federal Rule of Civil Procedure 39(b) to order a jury

trial notwithstanding this waiver.  Dkt. 143; *see* Fed. R. Civ. P. 38(d) ("A party waives a jury trial

unless its demand is properly served and filed.").  Accordingly, the Court determined that the trial

would proceed as a bench trial.  Dkt. 143.

In June 2023, Gao filed a proposed pretrial order (without any contribution from

Defendants) listing seven claims for trial: (1) a claim under the NYLL for failure to pay minimum

wage, (2) a claim under the NYLL for failure to pay overtime, (3) a claim under the NYLL for

failure to render spread-of-hours pay, (4) a claim under the NYLL for failure to provide a wage

notice, (5) a claim under the NYLL for failure to provide wage statements, (6) a claim under the

FLSA for retaliation, and (7) a claim under the NYLL for retaliation.  Dkt. 153 at 2-3.  Curiously,

Gao also submitted proposed jury instructions and proposed *voir dire* questions for prospective

jurors.  Dkts. 154-155.

The Court thus issued another Order, reminding the parties that the Court would be

conducting a bench trial, not a jury trial, and further ordering Defendants to explain their failure

to comply with the Court's April 19, 2022 Order that the parties file a proposed pretrial order

4

*jointly*. Dkt. 156.  Moreover, given that Gao raised a claim for unpaid minimum wage—which she had not included in the operative Complaint (or in any of the prior versions of her Complaint for that matter)—for the first time in her pretrial submission, the Court advised the parties that trial would not include that claim.  *Id.*  Finally, the Court ordered the parties to brief whether Gao had standing to assert her claims based on Defendants' alleged failure to provide wage notices and statements in violation of Sections 195(1) and 195(3) of the NYLL by June 26, 2023, and to be prepared to address the issue at the July 11, 2023 final pretrial conference.  *Id.* at 2.

On June 14, 2023, counsel for Savour Sichuan, Inc., Hong, and Wei filed a letter explaining his failure to contribute to the proposed pretrial order, citing personal health reasons and an apparent misunderstanding, Dkt. 157, and attached a revised proposed pretrial order, Dkt. 157-1 ("Joint PTO").[3]  On June 26, 2023, Gao timely submitted her brief on standing.  Dkt. 158.  Savour Sichuan, Inc., Hong, and Wei submitted their brief a day late.  Dkt. 159.  Fang and the Best Sichuan, Inc., as well as Duan (proceeding *pro se*), submitted nothing.

At the final pretrial conference on July 11, 2023, the Court clarified the scope of the issues to be tried.  It first explained that it would dismiss the "counterclaim" asserted by Duan, who was not present at the conference, because her self-styled counterclaim was not a cognizable cause of action; rather, it was a broad defense based primarily on equitable considerations.  Final PTC Tr. at 6:12-25.  The Court next confirmed with the parties that they had not been able to reach Zhang (who has not participated in the action since his December 2019 answer, Dkt. 28), *id.* at 7:1-14;

---

[3] At this time and through the final pretrial conference, Savour Sichuan, Inc., Hong, and Wei were represented by one attorney, and The Best Sichuan, Inc. and Fang were represented by another.  *See* Dkts. 17, 74, 75; Dkt. 177 ("Final PTC Tr.") at 1.  Two days before the trial, however, counsel for Savour Sichuan, Inc., Hong, and Wei entered his appearance for The Best Sichuan, Inc. and Fang, Dkt. 163, and thus represented all appearing Defendants at trial, *see* Tr. at 2:16-21, 3:4-21.

that Gao still intended to pursue her claims against Zhang (and La Vie) and so would move for default judgment after resolution of the bench trial, *id.* at 8:10-19; that the action would not be proceeding as a collective action, *id.* at 8:20-9:1; and that Savour Sichuan, Inc., Hong, and Wei would no longer be pursuing their counterclaims, *id.* at 9:2-17.

As to Gao's newly asserted minimum wage claim, Gao's counsel represented that the facts elicited at trial would "warrant an amendment of the complaint to conform to a nonpayment of minimum wage theory for two brief periods." *Id.* at 13:17-21.  The Court thus determined that it would "allow some leeway in offering that proof at trial," and that it would reserve ruling on the propriety of amendment until it received briefing from the parties after trial, particularly so that it could assess any prejudice to Defendants.  *Id.* at 14:20-15:9.  Gao's counsel also elaborated on Gao's "minimum wage theory" of standing for her NYLL wage notice and wage statement claims: Gao's counsel explained that the lack of a wage notice and wage statements resulted in a concrete injury because Gao was being paid less than the statutory minimum wage, and had she known that, she could have sought employment elsewhere or demanded a higher wage to continue working at the restaurant.  *Id.* at 17:6-19:8.  The Court reserved ruling on whether Gao had standing to bring those causes of action.  *Id.* at 19:17-23.

The three-day bench trial commenced on July 17, 2023, and ended on July 19, 2023.  Gao, Hong, Wei, Fang, and Duan testified at the trial.  Zhang did not appear.

At the trial's conclusion, the Court ordered the parties to submit proposed findings of fact and conclusions of law by September 15, 2023, and further directed the parties to include arguments on whether Gao should be permitted to amend her Complaint to add an unpaid minimum wage claim, and whether she has standing to bring her NYLL wage statement and wage notice claims.  Tr. at 353:3-355:12, 355:24-358:10.  The Court also advised that any motion for

default judgment against the non-appearing Defendants and any motion for attorneys' fees should be filed after the Court issues its findings of fact and conclusions of law.  *Id.* at 358:12-21.

On September 15, 2023, Gao and Duan each timely filed their proposed findings of fact and conclusions of law.  Dkts. 170 ("Duan Proposals"), 171 ("Gao Proposals").  In her submission, Gao discusses her claims for unpaid minimum wage under the FLSA and the NYLL, unpaid overtime under the FLSA and the NYLL, unpaid spread of hours under the NYLL, and unfurnished wage statements under the NYLL, and requests liquidated damages under both the FLSA and the NYLL.  *See generally* Gao Proposals.[4]  Gao failed to include any discussion of her NYLL wage notice claim, and so the Court deems that claim abandoned.  *See Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 697 (2d Cir. 1994) (explaining that the plaintiff "did not address the state law claims in its post-trial briefs and could be deemed to have abandoned them").  Gao instead discusses Defendants' purported failure to provide her with adequate notice of the tip credit as a part of the minimum wage claim she seeks to add.  Gao Proposals at 23-24.  Duan, in her post-trial submission, reiterates that she was not involved in Gao's employment and explains that she defers to the Court's conclusions of law.  *See generally* Duan Proposals.

On September 16, 2023, a day after the Court's deadline for post-trial submissions, counsel for Hong, Wei, Fang, Savour Sichuan, Inc., and The Best Sichuan, Inc. ("defense counsel") requested a "reasonable" extension of time to submit proposed findings and conclusions.  Dkt. 172.  The Court granted the request, extending the deadline to October 6, 2023, and expressly cautioning that defense counsel "should not expect any further extensions of th[e] deadline."  Dkt. 174.  Defense counsel nonetheless failed to comply with the Court's extended deadline of October 6, 2023.  Yet, on October 11, 2023, after Gao's counsel noted defense counsel's failure to make

---

[4] On the second day of trial, Gao withdrew her retaliation claims.  Tr. at 155:25-156:2.

post-trial submissions and asked that the Court decide the matter on the trial record, Dkt. 175, defense counsel submitted a letter claiming that he "manage[d] to put together the defendants' proposed findings of fact and conclusions of law" but needed someone to type the document due to "a series of technical problems, personal health issues, and family tragedies," Dkt. 176.  Defense counsel further indicated in that letter that he had set the wrong calendar date for the filing deadline. *Id.*  Although defense counsel's October 11, 2023 letter did not expressly seek an extension, on January 24, 2024, the Court nonetheless granted defense counsel "one final extension . . . [to] January 31, 2024 to file his clients' proposed findings of fact and conclusions of law."  Dkt. 179 at 2.  On February 1, 2024, shortly after midnight, defense counsel finally filed proposed findings of fact and conclusions of law on behalf of Hong, Wei, Fang, Savour Sichuan, Inc., and The Best Sichuan, Inc.  Dkt. 170 ("Defts. Proposals").

## II.  Post-Trial Amendment of the Complaint

As a preliminary matter, the Court grants Gao leave to add a claim for unpaid minimum wage.  Pursuant to Federal Rule of Civil Procedure 15(b), a district court may exercise its broad discretion to allow a party to "amend [its] pleadings to conform to the proof received into evidence at trial."  *Dimare Homestead, Inc. v. Alphas Co. of N.Y.*, 547 F. App'x 68, 69 (2d Cir. 2013); *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir. 1985) (explaining that a Rule 15(b) motion "rests in the sound discretion of the trial court").  Where, as here, the adverse party objects to evidence as outside the scope of the pleadings, the Court should nonetheless "freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits."  Fed. R. Civ. P. 15(b)(1); *see* Tr. at 224:13-20 (defense counsel objecting to the relevance of evidence presented in support of previously unasserted minimum wage claim).

8

Gao seeks to add an unpaid minimum wage claim based on the theory that—even though she was paid for her server hours at hourly rates corresponding to the New York minimum wage less the maximum tip credit—her employers were not entitled to take that tip credit because they failed to comply with certain wage notice requirements.  *See* Gao Proposals at 24.  She further asserts that she was compensated only for her scheduled hours, not the hours she *actually* worked.  *Id.* at 24-25.

The trial evidence in support of this minimum wage claim substantially overlaps with the facts alleged in the operative Complaint, and then offered at trial, to support her overtime and wage notice claims.  For instance, Gao's minimum wage claim as to uncompensated work time is supported by findings on the hours Gao worked and the rate at which she was paid—the same findings supporting an unpaid overtime claim.  And Gao's minimum wage claim as to inadequate notice of the tip credit is supported by findings on what if any written notice Gao received about her pay from her employers—the same findings supporting an unfurnished wage notice claim.  Accordingly, the Court discerns no prejudice arising from allowing Gao to amend her Complaint to include a minimum wage claim to conform to the evidence adduced at trial.  *Cf. Alishaev Brothers, Inc. v. LA Girl Jewelry, Inc.*, No. 17 Civ. 7505 (JGK), 2020 WL 2115175, *5 (S.D.N.Y. May 4, 2020) (finding no prejudice to the defendants from post-trial amendment of a complaint where "the facts surrounding [the] new claims are substantially similar to the original claim made in the Complaint and reiterated in pre-trial filings" (internal quotation marks omitted)); *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 529 (S.D.N.Y. 2011) (explaining that "amending the pleadings to conform to the evidence at trial in this manner adds no new issues to the case because the same set of facts involved in deciding" the amended claim also arise under a pleaded claim (internal quotation marks omitted)).

Furthermore, Gao included a minimum wage claim in her pretrial submissions, and again announced her intent to pursue that claim during the final pretrial conference.  *See* Joint PTO § IV(1); Final PTC Tr. at 14:17-21.  At that conference and during the trial, the Court reserved ruling on Gao's request to add such claim to allow Defendants to articulate any prejudice that may result from such amendment.  Final PTC Tr. at 13:20-15:9; Tr. at 354:10-19.  Yet in their post-trial submissions, Defendants make no argument against amendment of the Complaint to include the minimum wage claims, nor do they assert any prejudice from the proposed amendment, *see generally* Duan Proposals; Defts. Proposals, despite the Court's repeated warnings that its consideration of Gao's post-trial amendment would turn on their showing of prejudice, *see, e.g.*, Tr. at 7:15-24, 225:3-21, 354:10-19.  Thus, because the Court finds that Defendants were on sufficient notice of the very allegations that Gao now seeks to fit under a minimum wage claim, and given Defendants' failure to argue any prejudice resulting from allowing such claim, the Court grants Gao's request to amend her pleadings.  *See Robinson v. United States*, 332 F. Supp. 3d 516, 532 (E.D.N.Y. 2018) ("A post-trial Rule 15(b) motion 'may be granted if the party against whom the amendment is offered will not be prejudiced by the amendment and should be granted in the absence of such prejudice if the interests of justice so require.'" (quoting *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir. 1986))).

Accordingly, presently before the Court are Gao's claims for unpaid minimum wage under the FLSA and the NYLL, unpaid overtime under the FLSA and the NYLL,[5] unpaid spread-of-hours payments under the NYLL, and unfurnished wage statements under the NYLL.

---

[5] As noted, the proposed pretrial order submitted by Gao did not mention violations of the FLSA for failure to minimum wage or failure to pay overtime among "Plaintiffs' Claims Remaining to be Tried."  Dkt. 153 at 2-3; *see supra* I.  Rather, Gao only mentions her since withdrawn retaliation claim as falling under that statute.  Dkt. 153 at 3; *see* Tr. at 155:25-156:2.

### III.  Findings of Fact

"In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "As with any civil case, the plaintiff bears the burden of proving the elements of [the plaintiff's] claim by a preponderance of the evidence. . . .  In a bench trial, it is within the province of the district court as the trier of fact to decide [which] testimony should be credited."  *Wilson v. Calderon*, 367 F. Supp. 3d 192, 195-96 (S.D.N.Y. 2019) (internal quotation marks omitted).

As mentioned, Gao, Wei, Hong, Fang, and Duan testified at trial.  The Court finds at the threshold that each witness was largely credible.  Because many material facts are undisputed, however, the Court makes express credibility determinations only as necessary to resolve relevant disputes and otherwise draws its findings from unrefuted testimonial or documentary evidence.

### A.     The Parties

Defendant Savour Sichuan, Inc. is a New York corporation that operated a Chinese restaurant located at 108 West 39th Street, New York, New York 10018 until May 2019, when the restaurant burned down.  *See* Joint PTO § IX(1) (stipulation as to address and date of fire); *see also* Exhs. 4 (Gao's W-2 forms for 2017-2019 showing Savour Sichuan, Inc. as her employer), 5 (undated Certificate of Incorporation for Savour Sichuan, Inc.).  Between October 2018 and May 2019, that restaurant, also called Savour Sichuan, employed at least eleven non-managerial employees at a time.  *See* Exh. 8 (showing at least eleven employees working between January

---

Yet, the Complaint pleads violations of the FLSA for failure to pay overtime, Complaint ¶¶ 85-89, and Gao's post-trial proposed findings of fact and conclusions of law appears to seek liability under the FLSA, *e.g.*, Gao Proposals at 18-19, 24, 26-28.  Regardless, as noted below, *see infra* IV.A, Gao's FLSA claims fail as a matter of law based on the proof presented at trial.

2019 and May 2019); Tr. at 217:7-15 (Wei testifying as to accuracy of the list of Savour Sichuan employees in Exhibit 8).

Defendant The Best Sichuan, Inc., a corporation that was formed on June 11, 2019, operates The Best Sichuan, a Chinese restaurant at 47 West 39th Street, New York, New York 10018, less than a block away from Savour Sichuan's former site.  Joint PTO § IX(2); Tr. at 258:10-14.

Defendant La Vie En Szechuan Restaurant Corp., which did not answer the operative Complaint or appear at trial, is alleged to be a corporation with a principal place of business at 14 East 33rd Street, New York, New York 10016.  Complaint ¶ 7.  Defendant Yi Zhang, who also did not answer the operative Complaint or appear at trial, is alleged to be the owner of La Vie and the owner of Savour Sichuan, Inc. before 2018.  *Id.* ¶¶ 14, 15, 21, 22; Tr. at 264:24-25.

Defendant Xiaoman Duan is a retired scientist and professor from the Massachusetts Institute of Technology ("MIT").  Dkt. 170 at 2; *see also* Tr. at 14:8-15.  In 2018, Duan and Defendant Dongmei Wei purchased Savour Sichuan, Inc. from Zhang for $50,000.  *See* Exh. 6.[6] Duan financed the transaction because she considered Wei's husband, Defendant Weimin Hong, as if he were her own son, and she wanted to help Hong realize his dream of becoming the head chef of his own restaurant.  Tr. at 206:25-207:17, 218:12-14, 269:16-18, 282:21-23, 283:19-22, 332:15-16, 336:7-14.  After that 2018 purchase and until the May 2019 fire, Wei managed Savour Sichuan, and Hong was the restaurant's head chef.  *Id.* at 71:19-21, 74:10-12, 156:19-20, 210:9-12, 269:16.

---

[6] As reflected in the Equity Transfer Agreement, Zhang transferred 100% of his shares of Savour Sichuan, Inc. to Duan and Wei for $50,000.  Exh. 6 at 1.  In that same transaction, Duan and Wei then transferred 10% of the shares back to Zhang "to reward [him]" for assisting Duan and Wei with "government-related affairs and issues" regarding the restaurant's lease.  *Id.*

Defendant Jie Fang is an artificial intelligence research scientist.  *Id.* at 310:25.  Fang met Duan while Fang was a graduate student at MIT, *id.* at 317:1-5, and she views Duan as both a maternal figure and a mentor, *id.* at 324:13-21.  Fang is the sole owner of The Best Sichuan, Inc. *Id.* at 213:20-22.  In June 2019, Fang hired Wei and Hong, whom she had met through Duan, as the manager and head chef, respectively, of The Best Sichuan.

Plaintiff Xiaochun Gao worked at Savour Sichuan during two periods: first, from December 2016 to on or around February 6, 2018, and then again from October 2018 to January 2019.  *Id.* at 19:15-18, 20:8-12.  She testified that she also worked at La Vie En Szechuan on two days between 2016 and February 2018.  *Id.* at 42:11-20.  Gao never worked at The Best Sichuan. *Id.* at 85:7-25.

## B.    Relevant Period

At the outset, the Court sets forth the relevant period for purposes of the instant writing. Gao's claims encompass both periods she worked at Savour Sichuan, and she testified at length about her work there between 2016 and 2018.  *See, e.g.*, *id.* at 20:13-25:19 (Gao testifying as to how she was initially hired in 2016), 26:10-35:4 (Gao testifying on the scope her duties as a server and the hours she worked from 2016 to 2018).  It is undisputed that during this first period of employment, however, Gao's employer was Zhang.  *Id.* at 80:19-22 ("Q:  Now, when you started working there [at Savour Sichuan] in 2016, who was your boss?  Who was the manager or the owner over there at that time when you started?  A [Gao]:  Zhang Yi."); *see also* Gao Proposals at 20 ("It is likewise undisputed that before February 2018 [Gao] worked for Yi Zhang.").  As discussed, Zhang has not answered the operative Complaint and did not appear at trial.  Moreover, Gao did not meet or interact with Wei, Hong, or Duan in any capacity until sometime in January or February 2018—presumably around the time Wei and Duan purchased Savour from Zhang.  Tr.

at 43:2-5 (Gao testifying that she first met Wei around the end of January or beginning of February 2018), 43:21-24 (Gao testifying that she met Hong in January or February 2018), 70:11-14 (Gao testifying that she saw Duan for the first time in around January or February 2018), 81:17-20 (Gao testifying that Hong and Wei came to Savour Sichuan at some point in 2018).[7]  At that point, Gao still considered Zhang to be her employer.  Tr. at 42:1-3 ("Q [Gao's counsel]:  During the period 2016 December through 2018 February, who were your bosses?  A [Gao]:  It should have been Zhang Yi."), 176:5-7 (Wei testifying that "at the beginning of February," Gao "was still an employee of Zhang Yi"); *see also id.* at 73:21-25 (Gao testifying that Wei did not "act as a front of the [h]ouse manager" at any time before Gao left her employment with Savour Sichuan in 2018).

Accordingly, the Court declines to make any factual determinations as to Gao's first employment period at Savour Sichuan and considers only the trial evidence relevant to the claims arising from Gao's second employment period at Savour Sichuan between October 2018 and January 2019.[8]

---

[7] At trial, Gao's counsel asked Wei whether her husband, Hong, had incorporated Savour Sichuan, Inc. at its inception, and offered into evidence an *undated* Certificate of Incorporation signed by Hong.  *See* Tr. at 178:5-15, 182:10 (document received into evidence as Exhibit 5); *see* Exh. 5.  The Court credits Hong's and Wei's testimony that Hong was not the original incorporator of Savour Sichuan, and that Hong signed the undated Certificate of Incorporation document *after* Wei and Duan's February 2018 purchase of Savour Sichuan from Zhang.  *See* Tr. at 180:11-13, 268:1-7.

[8] Gao acknowledges that Zhang's personal liability is to be determined *after* the Court determines the liability and damages as to the appearing Defendants.  *See* Gao Proposals at 11-12. She nonetheless appears to seek findings of liability and damages for her first employment period at this juncture.  *See id.* at 12-15 (discussing events before February 2018); *see also* Dkt. 171-14 (Gao proposing damages calculations for alleged violations arising before February 2018). Relying on language in the 2018 Equity Transfer Agreement, Exh. 6, she asserts that Duan, Wei, and Hong "agreed before a notary to indemnify Yi Zhang and as such are liable for the period prior to February 1, 2018."  Gao Proposals at 5, 7, 8, 20.  But she has failed to explain how she has standing to enforce that agreement, to which she is patently not a party, or whether the Court may properly address the scope of the appearing Defendant's indemnification duties owed to Zhang before it makes any liability findings against Zhang.

### C.     Duan's, Wei's, and Hong's Roles at Savour Sichuan

As mentioned at *supra* III.A, Zhang sold his shares in Savour Sichuan, Inc. to Duan and Wei for $50,000, pursuant to an Equity Transfer Agreement, effective on February 1, 2018.  *See* Exh. 6.  Under the terms of the agreement, fifty percent of the shares were transferred to Wei, forty percent of the shares were transferred to Duan, and ten percent of the shares were retained by Zhang.  *Id.*; *see supra* n.6.  All three signatories were deemed a part of Savour Sichuan, Inc.'s Board of Directors, with Wei named the President and Zhang named the Vice President of the Board.  Exh. 6.  Wei and Duan assumed "the obligations of rent, insurance, and maintenance required by the existing lease terms," as well as the responsibilities of staff management, tax payments, and all other legal responsibilities for Savour.  *Id.*  Duan, who lacked any experience in the restaurant business, financed this transaction out of her affinity for Hong.  Tr. at 334:9-24, 335:12-337:5.

Savour Sichuan remained open for the first week of February 2018 and was subsequently closed for renovations for three weeks.  *Id.* at 138:24-139:4.  Gao met Duan, Wei, and Hong, for the first time in late January or early February when they visited the restaurant to start these renovations.  *Id.* at 43:2-44:5.  Although this was the only time Gao saw Duan during Gao's employment at Savour Sichuan, Gao testified that she believed Duan was the owner of Savour Sichuan because, according to Gao, Wei had introduced Duan as the restaurant's "boss."  *Id.* at 70:4-14.  Wei denied ever making such an introduction.  *Id.* at 208:21-23 ("Q [Gao's counsel]: Isn't true that at one point you introduced Ms. Duan to Ms. Gao as your boss or the owner of the restaurant?  A [Wei]:  No.  I had not.").  Having observed the testimony of both Gao and Wei, the Court credits Wei's testimony on this issue and finds that Wei never introduced Duan as the boss of Savour Sichuan.

Savour Sichuan reopened at the end of February 2018 after this renovation period. *Id.* at 139:5-10. In her role as Savour Sichuan's "front of the house manager," Wei was responsible for hiring "front of the house workers," which included "servers, bussers, [and] cashiers." *Id.* at 210:9-23. Wei made these hiring decisions without input from Duan, who was not involved with managing the restaurant in any capacity. *Id.* at 208:12-20, 210:17-19, 266:8-10. Wei was also responsible for scheduling these workers' shifts and determining and disbursing their pay. *Id.* at 48:23-24, 49:3-6, 56:23-24, 210:9-12. As the head chef, Hong managed the "back of the house at Savour Sichuan" and supervised the "back of the house workers," which included "cooks, dishwashers, [and] ingredient preparers." *Id.* at 210:24-211:14. Hong had the authority to hire and fire these workers. *Id.* at 293:13-16. Wei also hired the "back of the house" workers (albeit with her husband's input) and managed the "paperwork in that regard." *Id.* at 211:5-8.

On June 6, 2018, Wei's shares in Savour Sichuan, Inc. were transferred to Hong, who also assumed Wei's position as President. Exhs. 7 (Supplement to Equity Transfer Agreement), 8 (June 7, 2018 meeting minutes for Savour Sichuan, Inc.'s Board of Directors). Duan retained her forty percent ownership of the corporation's shares and her position as an officer. Tr. at 346:10-12; *see also* Exhs. 7, 8.

**D.      Gao's October 2018 to January 2019 Employment at Savour Sichuan**

On February 6, 2018, Gao traveled to China to visit her children; she returned to the United States in April or May 2018. Tr. at 19:22-24, 20:6-7. In October 2018, Wei called Gao and offered her a job at Savour Sichuan, which Gao accepted. *Id.* at 44:16-25. According to Gao, Wei did not discuss Gao's schedule or wages during that call. *Id.* at 45:3-4. Gao further testified that, upon her return, she did not receive written notice of her pay rate, notice that she would be paid less than the minimum wage but would earn tips to make up the difference, or any onboarding paperwork.

*Id.* at 45:3-20.  On the other hand, Wei testified that it was her usual practice to provide new hires with information about their base pay rates, job description, and hours in writing, and that she had provided this information to Gao.  *Id.* at 133:25-134:8, 146:20-25, 242:1-10.  Wei further testified that the wage notice she provided to Gao was destroyed in the 2019 fire.  *Id.* at 242:11-15.

Wei initially hired Gao to work as a server, but Gao also worked additional shifts on the weekends as a cashier.  *Id.* at 56:20-24, 57:9-11, 153:24-154:4.  In January 2019, Wei fired Gao. *Id.* at 75:5-12.

### 1.    Server Hours and Wages

As a server, Gao worked one of three shifts, each spanning 10.5 hours with a ninety-minute break built into the shift schedule: the early shift ran from 11:00 a.m. to 9:30 p.m.; the middle shift ran from 11:30 a.m. to 10:00 p.m.; and the late shift ran from 12:00 p.m. to 10:30 p.m.  *Id.* at 176:19-22; *see also id.* at 54:9-16 (Gao explaining that nine hours of work time is assumed for each shift).  Employees could also work a half day from 11:00 a.m. to 4:00 p.m.  *Id.* at 53:10-16.

At trial, the Court received into evidence Savour Sichuan's server shift schedule for each week from October 8, 2018 to January 13, 2019—except for the week from December 31, 2018 to January 6, 2019.  *Id.* at 50:3-6; Exh. 1 (Savour Sichuan's server schedule).  The schedule shows each server's shift for each day of the week, using Chinese characters to indicate the specific shift—*i.e.*, early (早), middle (中), and late (晚)—and an "X" to indicate that no shift had been scheduled for the server.  Tr. at 47:11-16 (Gao explaining that a certain Chinese character refers to the middle shift), 48:9-10 (Gao explaining that an "X" means no shift), 51:9-11 (Gao explaining that a certain Chinese character refers to the early shift), 52:19-21 (Gao explaining that a certain Chinese character refers to the late shift).  The schedule refers to Gao by her English name, Lora. *Id.* at 47:6-7; Exh. 1.  And in the "Note" column, it shows the total hours scheduled for each server

for that week.  *See, e.g.*, Tr. at 54:9-13 (Gao explaining that for the week of December 17, 2018 to December 23, 2018, the number "46" in the final column comes from multiplying five days of full shifts by nine hours and then adding one, as indicated by the "+1" in the final column); *see also* Exh. 1.

The Court also admitted Gao's paystubs[9] for her work as a server for each of the fourteen weeks from October 8, 2018 to January 7, 2019.  Tr. at 65:19-66:1, 66:16-23; *see* Exh. 3.  The total weekly hours recorded in the paystubs match the total weekly hours recorded in the "Note" column of Savour Sichuan's server schedule.  *Compare* Exh. 1 *with* Exh 3.  The paystubs further show that the restaurant paid Gao at a base rate of $8.65 per hour for her work in 2018 (or, more precisely, before December 31, 2018) and $10 per hour for her work in 2019 (or, more precisely, on and after December 31, 2018).  Exh. 3.  They show in separate places her wages from the restaurant at those rates and the wages she earned from tips, with the tips for any given week ranging from $240 to $856.  *Id.*  The pay stubs did not reflect that the base rates ($8.65 or $10.00 per hour) were determined by subtracting a tip credit ($4.35 or $5.00) from the minimum wage ($13.00 or $15.00 per hour).  *Id.*; *see also* Tr. at 226:8-20.  Wei was informed by her accountant that "as long as [the] base pay and the tip pay total is greater than the minimum 15," she was complying with labor laws.  Tr. at 227:21-24.

Gao testified credibly that the Savour Sichuan server schedule accurately recorded the days and shifts she was assigned, but that the recorded total hours did not reflect the hours she *actually* was at Savour Sichuan.  *Id.* at 50:9-14, 65:19-66:1, 91:21-92:3, 94:8-11.  She explained that "if

---

[9] Without citation to the trial record, defense counsel maintains in his clients' proposed factual findings that Gao "admitted that Defendants did in fact furnish wage statements."  Defts. Proposals at 2.  The Court assumes that this is a reference to the paystubs that Gao testified to receiving.  Tr. at 65:5-13.

[she] left later than the scheduled time[,] then those times were not reflected." *Id.* at 50:12-14. For instance, when she worked the middle shift, she often stayed anywhere from five to twenty minutes past the scheduled end of the shift. *Id.* at 47:18-23. When she worked the late shift, she typically stayed twenty to thirty minutes past the scheduled end of the shift. *Id.* at 52:24-53:1. Only when she worked the early shift did she leave at the scheduled time. *Id.* at 51:15-18. Gao did not explain why she tended to stay past the scheduled time for her late and middle shifts, or how she spent those extra minutes. Gao additionally testified on cross-examination, "There were times that we were so busy I didn't take my break time[,] but I didn't say I didn't take any break." *Id.* at 89:24-25. But she offered no specific testimony, or even a rough estimate, as to how often she worked through her scheduled breaks as a server.

At trial, Wei seemed to believe that the server schedule reflected the hours the servers "actually worked," but she lacked personal knowledge of the precise times that employees arrived, went on their breaks, returned from their breaks, and left work. *See, e.g.*, *id.* at 166:7-168:8. The servers' precise work times were apparently managed by another employee named "Kris," who was not present at trial. *Id.* at 164:17-19, 167:9-12. Accordingly, no reliable testimony was provided to refute Gao's contention that her actual times at Savour Sichuan varied from the hours reflected in the restaurant's weekly schedules. *See also id.* at 241:8-25 (Wei testifying that the "time-in and time-out records" were stored in the restaurant and destroyed in the fire).

The Court thus credits Gao's testimony that the Savour Sichuan schedule and her paystubs accurately showed the shifts she was assigned, but that the hours recorded therein (reflecting nine working hours per shift) failed to account for the extra minutes Gao typically stayed past the shift time—*i.e.*, about five to twenty additional minutes when she worked the middle shift (for an average of 12.5 additional minutes per middle shift) and about twenty to thirty additional minutes

when she worked the late shift (for an average of twenty-five additional minutes per late shift). The Court declines to find any other discrepancies between the reported hours and the hours Gao *actually* worked based on Gao's vague testimony that "[t]here were times" she did not avail herself of the ninety-minute breaks. *Id.* at 89:24-25. Any finding of additional time worked from that undeveloped testimony would be purely speculative.

Accordingly, for each of the fourteen weeks from October 8, 2018 to January 13, 2019, the Court makes the following findings as to Gao's shifts as a server:

- From October 8 to October 14, 2018, Gao worked four middle shifts. Tr. at 50:15-18; Exh. 1. She was compensated for thirty-six hours of work that week: $311 in regular wages (at a base rate of $8.65 per hour) and $529 in tips, for a total of $840. Exh. 3. She stayed at the restaurant for fifty minutes beyond her scheduled time that week.

- From October 15 to October 21, 2018, Gao worked four middle shifts. Tr. at 50:19-22; Exh. 1. She was compensated for thirty-six hours of work that week: $311 in regular wages and $537 in tips, for a total of $848. Exh. 3. She stayed at the restaurant for fifty minutes beyond her scheduled time that week.

- From October 22 to October 28, 2018, Gao worked three middle shifts and one early shift. Tr. at 50:23-51:25; Exh. 1. She was compensated for thirty-six hours of work that week: $311 in regular wages and $487 in tips, for a total of $799. Exh. 3. She stayed at the restaurant for 37.5 minutes beyond her scheduled time that week.

- From October 29 to November 4, 2018, Gao worked four middle shifts. Tr. at 52:12-15; Exh. 1. She was paid for thirty-six hours of work that week: $311 in regular wages and $528 in tips, for a total of $839. Exh. 3. She stayed at the restaurant for fifty minutes beyond her scheduled time that week.

20

- From November 5 to November 11, 2018, Gao worked three middle shifts.  Tr. at 52:16-18; Exh. 1.  She was paid for twenty-seven hours of work that week: $233 in regular wages and $368 in tips, for a total of $602.  Exh. 3.  She stayed at the restaurant for 37.5 minutes beyond her scheduled time that week.

- From November 12 to November 18, 2018, Gao worked one late shift and two middle shifts.  Tr. at 53:2-5; Exh. 1.  She was paid for twenty-seven hours of work that week: $233 in regular wages and $491 in tips, for a total of $724.  Exh. 3.   She stayed at the restaurant for fifty minutes beyond her scheduled shifts that week.

- From November 19 to November 25, 2018, Gao worked one late shift, two middle shifts, and one half-day shift.  Tr. at 53:6-16; Exh. 1.  She was paid for thirty-two hours of work that week: $276 in regular wages and $604 in tips, for a total of $880.  Exh. 3.  She stayed at the restaurant for fifty minutes beyond her scheduled time that week.

- From November 26 to December 2, 2018, Gao worked one late shift and two middle shifts.  Tr. at 53:17-21; Exh. 1.  She was paid for twenty-seven hours of work that week: $233 in regular wages and $348 in tips, for a total of $582.  Exh. 3.  She stayed at the restaurant for fifty minutes beyond her scheduled time that week.

- From December 3 to December 9, 2018, Gao worked one late shift, one early shift, and two middle shifts.  Tr. at 53:22-25; Exh. 1.  She was paid for thirty-six hours of work that week: $311 in regular wages and $581 in tips, for a total of $893.  Exh. 3.  She stayed at the restaurant for fifty minutes beyond her scheduled time that week.

- From December 10 to December 16, 2018, Gao worked one late shift and two middle shifts.  Tr. at 54:1-4; Exh. 1.  She was paid for twenty-seven hours of work that week: $233 in

regular wages and $467 in tips, for a total of $701.  Exh. 3.  She stayed at the restaurant for fifty minutes beyond her scheduled time that week.

- From December 17 and December 23, 2018, Gao worked one late shift, four middle shifts, and an extra hour on one of those days.  Tr. at 54:5-19; *see id.* at 54:9-13 ("Q [Gao's counsel]:  Next to the 46th to the left of it in the note column, there appears to be a plus 1.  Do you know what that refers to?  A [Gao]:  Well, based on the week that I have back then for me five days, nine hours, so that makes it 45, then plus 1, I guess it is []46 hours."); *see also* Exh. 1.  She was paid forty-six hours of work that week: $423 in regular wages (at a rate of $8.65 per hour for forty of those hours and an overtime rate of $12.98 per hour for six of those hours) and $856 in tips, for a total of $1,280.  Exh. 3.  Wei arrived at the listed overtime pay rate of $12.98 per hour by multiplying $8.65 (the minimum wage of $13.00 less the $4.35 tip credit) by 1.5.  Tr. at 221:24-222:5, 223:3-4.  Wei testified that Zhang taught her how to calculate an employee's overtime rate, and also that "an employee from the accounting office mentioned something about [a] 1.675 [multiplier]" for determining overtime rates.  *Id.* at 227:8-11, 228:9-12.  Gao stayed at the restaurant for 75 minutes beyond her scheduled time that week.

- From December 24 to December 30, 2018, Gao worked three middle shifts.  *Id.* at 54:17-21; Exh. 1.  She was paid for twenty-seven hours of work that week: $233 in regular wages and $516 in tips, for a total of $750.  Exh. 3.  She stayed at the restaurant for 37.5 minutes beyond her scheduled time that week.

- From December 31, 2018 to January 6, 2019, Gao worked four full shifts.  Exh. 3 (paystub for that period showing thirty-six hours for which Gao was compensated).  Gao was paid for thirty-six hours of work that week: $360 in regular wages (now at a base rate of $10

per hour) and $438 in tips, for a total of $798.  Exh. 3.  No evidence was adduced at trial as to which particular shifts Gao worked that week.  *See* Exh. 1 (server schedule skipping the week of December 31, 2018 to January 6, 2019); *see also* Tr. at 54:22-55:7 (Gao discussing the missing week from the server schedule and testifying that she worked "two three days at least as a waitress" that week).  But given that Gao was working primarily middle and late shifts during this period, the Court estimates that Gao stayed at the restaurant for 75 minutes (reflecting two middle shifts and two late shifts) beyond her scheduled time that week.

- From January 7 to January 13, 2019, Gao worked two late shifts.  Tr. at 55:8-11; Exh. 1. She was paid for eighteen hours of work that week: $180 in regular wages and $240 in tips, for a total of $420.  Exh. 3.  She stayed at the restaurant for fifty minutes beyond her scheduled time that week.  Gao's last server shift was on January 9, 2019.  Exh. 1; Tr. at 245:14-17.

As reflected in the above findings, Gao worked a total of forty-nine full shifts and one half shift. These forty-nine full shifts each spanned 10.5 hours.  The Court further finds that Gao did not receive extra compensation for working those full shifts.  *See* Tr. at 240:4-24.

### 2.  Cashier Hours and Wages

Gao was paid in cash for her work as a cashier.  *Id.* at 56:20-23, 64:1-13.  Her cashier shifts ran from 11:00 a.m. to 10:30 p.m., including a ninety-minute break "per restaurant policy" that resulted in ten paid hours per shift.  *Id.* at 60:22-61:6, 150:21-151:3; Exh. 2.  Gao was paid $130 per shift.  Tr. at 58:12-18.  Gao testified that she was required to keep the restaurant's phone with her during scheduled breaks in case someone called in a takeout order, and that two or three times a week she was required to process such orders during her break.  *Id.* at 61:14-62:1.  She further testified that she often stayed ten to twenty minutes past the end of her shift (for an average of

fifteen minutes per shift), waiting for customers to leave the restaurant so that she could "close out." *Id.* at 60:23-61:3. Defendants offered no contrary testimony on these latter points, and the Court thus credits Gao's testimony on the nature of her cashier breaks and the extra time she worked after the end of her shift.

Wei and Gao did, however, offer conflicting testimony on the end date of Gao's cashier shifts and the documentation of pay that Gao received from Savour Sichuan. For reasons that follow, where Wei's and Gao's testimony conflict, the Court credits Wei's testimony.

At trial, Gao offered into evidence pay receipts from the restaurant showing her pay for each of the fourteen days she worked as a cashier between October 28, 2018 and December 16, 2018. *Id.* at 57:17-24, 60:2-13; *see* Exh. 2. The forms included fields for the employee's name, dates worked, position, hourly rate, overtime rate, working hours, overtime hours, base salary, overtime pay, bonus, and total income. *See* Exh. 2. The pay receipts for Gao showed her name, position (as a cashier), dates worked, her hourly rate (as $13.00), overtime rate (as $19.50),[10] her base salary (reflecting pay for ten-hour shifts), and her total income (reflecting her base salary and any bonuses), as well as Gao's signature at the bottom. *Id.*; Tr. at 103:17-24.

Gao testified that she was never given a copy of those forms to keep for herself, Tr. at 65:14-18, that she was never given an Internal Revenue Service Form 1099 for her work as a cashier, *id.* at 64:14-16, and that she was unable to report the pay she received as a cashier on her taxes for the years 2018 and 2019, *id.* at 64:17-19. When asked whether she worked any cashier shifts during the week of December 17, 2018 to December 23, 2018, Gao answered, "For this week I don't remember exactly, but if I were then Saturday, the 22nd." *Id.* at 62:14-21. When asked

---

[10] The first page of Exhibit 2 shows an overtime rate of $19 per hour, which Wei acknowledged was a mistake. Tr. at 235:22-236:2.

whether she worked any days as a cashier the following week (from December 24 to December 30, 2018), she answered, "I think those two days over the weekend." *Id.* at 62:22-63:2. When asked whether she worked any days the week starting December 31, 2018, she testified, "I think so, but it's been a long time" before asserting that she worked on the "12th and 13th." *Id.* at 63:5-11. Finally, when counsel redirected Gao to consider the week of December 31, 2018 to January 6, 2019 (rather than the following week), she testified, "All weekends before I left the job I should have worked." *Id.* at 63:12-16.

Conversely, Wei testified that Gao was given a copy of each of the forms showing her pay as a cashier, explaining that only the upper portion of each pay receipt was represented in Exhibit 2 and that the bottom portion of each of the original forms was a "replica of the upper portion" and "was given to the recipient when they received their pay." *Id.* at 229:8-230:9. Wei further asserted that she provided Gao with a Form 1099 in 2018, *id.* at 243:3-5, even testifying as to the precise total reported on that form and then acknowledging that the reported total was erroneous, *id.* at 243:18-244:17. Wei also testified that Gao's last day as a cashier at Savour Sichuan was "somewhere in the middle of December 2018." *Id.* at 154:5-7; *see also* Exh. 2.

On these points, the Court credits Wei, whose testimony was direct, responsive, detailed, and supported by the documentary evidence. Wei testified credibly that she provided Gao with a copy of each pay receipt and a Form 1099, and that Gao's last day as a cashier was in the middle of December 2018, consistent with the documents admitted at trial.

Gao, on the other hand, appeared unable to remember whether she worked past mid-December 2018, and ultimately could only offer that she "should" have worked every weekend before she left the job, Tr. at 63:15-16—testimony the Court finds unreliable, especially in light of Wei's unequivocal assertion that Gao's last day as a cashier fell in the middle of December

2018. *Id.* at 154:5-7.  Moreover, although Gao purported to largely recall when and how often she worked as a cashier at trial, approximately five years after the fact, she also testified that she was unable to report the pay she received as a cashier on her tax forms in 2018 and 2019.  The Court struggles to reconcile this assertion with Gao's clear understanding when she testified that she was being paid $130 per shift.  *See id.* at 58:12-18; *see also id.* at 68:9-10 (testifying that "I was told I would be paid $130 for a day" when she worked as a cashier).  Presumably, Gao would have had even better recollection of the number of her cashier shifts back when she was preparing her tax forms years ago and could have then performed the simple arithmetic of multiplying that number of shifts by $130 to report her total pay for that year.  *Cf. id.* at 105:2-5 ("Q [defense counsel]: And the amount of $390 is greater than the previous one, $130; right?  A [Gao]:  Greater than that?  What does that mean?  Three days' worth of wages added together, of course it makes it $390.").  When cross-examined on her pay for her cashier shifts, Gao appeared defensive and, at times, evasive—further undermining her credibility on that subject.  *See, e.g.*, *id.* at 107:20-23 ("Q [defense counsel]:  You received [the cashier pay receipt] at the same time as you received the cash; correct?  A [Gao]:  I wouldn't put my name on it if I didn't receive the receipt.").  The Court thus declines to credit these aspects of Gao's testimony.

Accordingly, the Court finds that Gao worked as a cashier on various dates from October 28, 2018 to December 16, 2018, and was paid as follows:

- From October 22 to October 28, 2018, Gao worked one cashier shift (on October 28); she was paid $130 for ten hours of work.  Exh. 2 at 1.  She stayed at work to tend to customers for approximately fifteen minutes past her scheduled time that week.

- From October 29 to November 4, 2018, Gao worked one cashier shift (on November 4); she was paid $130 for ten hours of work. *Id.* at 2. She stayed at work to tend to customers for approximately fifteen minutes past her scheduled time that week.

- From November 5 to November 11, 2018, Gao worked two cashier shifts (on November 10 and November 11); she was paid for $260 for twenty hours of work. *Id.* She stayed at work to tend to customers for approximately thirty minutes past her scheduled time that week.

- From November 12 to November 18, 2018, Gao worked two cashier shifts (on November 17 and November 18); she was paid $260 for twenty hours of work. *Id.* at 3. She stayed at work to tend to customers for approximately thirty minutes past her scheduled time that week.

- From November 19 to November 25, 2018, Gao worked two cashier shifts (on November 24 and November 25); she was paid for $260 for twenty hours of work, and an extra $100 as an "allowance for Thanksgiving Day," Tr. at 59:23-60:1; Exh. 2 at 3. She stayed at work to tend to customers for approximately thirty minutes past her scheduled time that week.

- From November 26 to December 2, 2018, Gao worked two cashier shifts (on December 1 and December 2); she was paid $260 for twenty hours of work. Exh. 2 at 4. She stayed at work to tend to customers for approximately thirty minutes past her scheduled time that week.

- From December 3 to December 9, 2018, Gao worked two cashier shifts (on December 8 and December 9) and was paid $260 for twenty hours of work. *Id.* She stayed at work to tend to customers for approximately thirty minutes past her scheduled time that week.

- From December 10 to December 16, 2018, Gao worked two cashier shifts (on December 15 and December 16) and was paid $260 for twenty hours of work. *Id.* She stayed at work to tend to customers for approximately thirty minutes past her scheduled time that week.

As reflected in the above findings, Gao worked fourteen total cashier shifts. Each of those cashier shifts—which again commenced at 11:00 a.m. and went until approximately 10:45 p.m.—spanned 11.5 hours. The Court further finds, from reviewing the pay receipts for these shifts, that Gao received no extra compensation for working them. *See* Exh. 2.

### 3. Combined Hours

When Gao's scheduled hours for her cashier and server shifts are combined—even without considering any additional time she may have worked outside her scheduled work hours, whether during breaks or after the scheduled shift ended—Gao was scheduled to work over forty hours during the weeks of October 22, 2018 to October 28, 2018, and each subsequent week up until and including the week of December 10, 2018 to December 16, 2018. For these weeks, during which Gao worked both cashier and server shifts, the Court finds that Gao was scheduled to work the following total hours:

- From October 22 to October 28, 2018, Gao was scheduled to work forty-six hours.

- From October 28 to November 4, 2018, Gao was scheduled to work forty-six hours.

- From November 5 to November 11, 2018, Gao was scheduled to work forty-seven hours.

- From November 12 to November 18, 2018, Gao was scheduled to work forty-seven hours.

- From November 19 to November 25, 2018, Gao was scheduled to work fifty-two hours.

- From November 26 to December 2, 2018, Gao was scheduled to work forty-seven hours.

- From December 3 to December 9, 2018, Gao was scheduled to work fifty-six hours.

- From December 10 to December 16, 2018, Gao was scheduled to work forty-seven hours.

Gao was not paid at an overtime rate for any of the hours she worked past the forty-hour threshold in the above-listed weeks.  *See* Exhs. 2, 3.  At trial, Wei explained her view—which she "made [] clear to [Gao]"—that because the cashier and server positions are "two different and separate jobs," Wei did not need to combine the scheduled hours or "use the [overtime] calculation" in determining Gao's pay.  Tr. at 234:10-13.

### E.    The Best Sichuan

As discussed, The Best Sichuan, Inc. was formed on June 11, 2019 and operates a restaurant at 47 West 39th Street in Manhattan called The Best Sichuan.  Joint PTO § IX(2); Tr. at 258:10-14.  Fang is the sole owner of The Best Sichuan, Inc.  Tr. at 213:20-22, 311:7-9.

After Savour Sichuan burned down in May 2019, Fang hired Hong as the head chef and Wei as the general manager of The Best Sichuan, delegating the vast majority of operational duties to the couple.  *Id.* at 214:16-18 ("Q [Gao's counsel]:  Isn't it true that Ms. Fang essentially relied on you and your husband to actually run the restaurant The Best Sichuan?  A [Wei]:  Yes.").  Although Wei runs her hiring decisions by Fang and keeps Fang updated on the business, Fang largely views her own role in the restaurant as a "passive investor."  *Id.* at 310:25-311:19, 311:21-24, 319:1-7.

Several other former employees of Savour Sichuan also went to work at The Best Sichuan.  *Id.* at 215:12-217:14; *see also* Exhs. 8 (list of Savour Sichuan employees), 9 (list of The Best

Sichuan employees).  Because of its proximity to the former Savour Sichuan, The Best Sichuan serves many of the same customers; and because Hong was the head chef at both restaurants, The Best Sichuan also serves dishes similar to those that had been served at Savour Sichuan.  Tr. at 218:9-219:2.

## IV.  Conclusions of Law

### A.    FLSA Claims

As an initial matter, the Court finds that Gao has failed to meet her burden of proof on her FLSA-based claims.[11]  The FLSA's minimum wage and overtime requirements provide coverage to those "employees who . . . [are] engaged in commerce or in the production of goods for commerce, or [are] employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 206(a).  "The two categories are commonly referred to as 'individual' and 'enterprise' coverage, respectively."  *Jacobs v. N.Y. Foundling Hosp.*, 577 F.3d 93, 96 (2d Cir. 2009) (per curiam); *accord Xiao Dong Fu v. Red Rose Nail Salon*, No. 15 Civ. 7465 (KPF), 2017 WL 985893, at *5 (S.D.N.Y. Mar. 13, 2017).  "Individual coverage" applies to an employee who has "engaged in commerce or . . . in the production of goods for commerce."  *Boekemeier v. Fourth Universalist Soc. in City of N.Y.*, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) (internal quotation marks omitted); *accord* 29 U.S.C. § 207(a)(1).  This type of coverage is implicated when "a substantial part of the employee's work [is] related to interstate commerce."  *Boekemeier*, 86 F. Supp. 2d at 287 (internal quotation marks omitted) (quoting *Divins v. Hazeltine Elecs. Corp.*, 163 F.2d 100, 103 (2d Cir. 1947)); *accord Yupa v. Country Stone & Fence Corp.*, No. 14 Civ. 7384,

---

[11] Although Defendants do not argue in their proposed findings of fact and conclusions of law that Gao has failed to establish that her employment was covered by the FLSA, *see generally* Duan Proposals; Defts. Proposals, the Court nonetheless must satisfy itself that Gao has proven all elements of her claims by a preponderance of the evidence.

2017 WL 27957, at *3 (E.D.N.Y. Jan. 3, 2017).  Enterprise coverage, on the other hand, applies when an employer

> (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
>
> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 . . . .

29 U.S.C. § 203(s)(1)(A).

Gao has offered no evidence that she had any contact with out-of-state customers or businesses during her employment at Savour Sichuan, and so cannot show her entitlement to individual coverage.  *Jian Long Li v. Li Qin Zhao*, 35 F. Supp. 3d 300, 308 (E.D.N.Y. 2014) ("As a basic rule, if [the plaintiff] did not have any contact with out-of-state customers or businesses, he cannot be individually covered under the FLSA." (internal quotation marks omitted)).  Presumably, Gao intended to proceed under an enterprise coverage theory.  *See* Complaint ¶ 8 ("Upon information and belief, the gross venue [sic] of Savour [Sichuan] Restaurant was not less than $500,000.00.").  But she offered no evidence at trial of Savour Sichuan's gross revenue.  Accordingly, the Court dismisses Gao's FLSA-based claims.  *Cf. Salustio v. 106 Columbia Deli Corp.*, 264 F. Supp. 3d 540, 551 (S.D.N.Y. 2017) ("Here, because the $500,000 threshold was not met, there is no 'enterprise coverage' and plaintiffs' claims under the FLSA must be dismissed."); c*f. Liu v. Millenium [sic] Motors Sports, LLC*, No. 17 Civ. 6438 (RPK) (RER), 2021 WL 4268136, at *4 (E.D.N.Y. May 24, 2021) ("The NYLL, however, does not require that the employer have a nexus with interstate commerce or a minimum in annual sales or business."), *report and recommendation adopted by* 2021 WL 3463193 (E.D.N.Y. Aug. 6, 2021).

B.      **Jurisdiction Over Gao's NYLL Claims**

Although no federal claims remain in this action, the Court will continue to exercise its supplemental jurisdiction over Gao's state law claims under the NYLL.  Title 28, United States Code, Section 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy."  Stated differently, supplemental jurisdiction over state law claims is appropriate where those claims "derive from a common nucleus of operative fact" as the federal claims.  *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (internal quotation marks omitted).  It is well established that NYLL and FLSA claims arising out of the same compensation policies and practices derive from the same common nucleus of operative fact. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011).  A court may nonetheless decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  But in such circumstance, a district court should decline to exercise supplemental jurisdiction only if doing so promotes the interests of "economy, convenience, fairness, and comity."  *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004).

Here, it would be grossly inefficient, inconvenient, and fundamentally unfair to both parties to require them to retry Gao's NYLL claims with identical evidence in state court.  Accordingly, the Court will continue to exercise supplemental jurisdiction over Gao's NYLL claims, which, once again, include claims for unpaid spread of hours, unpaid minimum wage, unpaid overtime, and unfurnished wage statements. *Cf. Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56-57 (2d Cir. 2004) (upholding retention of supplemental jurisdiction where all federal claims were dismissed).

**C.      Proper Defendants**

Liability under the NYLL attaches only to a defendant that qualifies as an "employer," which the statute defines as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service," N.Y. Lab. Law §§ 190(3).  *See Ruixuan Cui v. E. Palace One, Inc.*, No. 17 Civ. 6713 (PGG), 2019 WL 4573226, at *6 (S.D.N.Y. Sept. 20, 2019) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).  Corporate Defendant Savour Sichuan, Inc., certainly qualifies as Gao's employer.  *See* Joint PTO § IX(4); *see also* Exh. 3 (Savour Sichuan, Inc. listed as employer on Gao's paystubs). Gao also proceeds against Hong, Wei, and Duan in their individual capacities as her purported "employers" at Savour Sichuan.  Gao Proposals at 20.  She further attempts to hold The Best Sichuan, Inc. and its owner Fang liable under a successor liability theory.  *Id.* at 21; *see also* Tr. at 157:17-22.

**1.      The Status of Wei, Hong, and Duan as Employers at Savour Sichuan**

At Savour Sichuan, only Wei and Hong exercised the requisite degree of control over Gao and/or other Savour Sichuan employees to qualify as an "employer."  Courts have generally interpreted the NYLL's definition of an "employer" coextensively with definition under the FLSA, *Ruixuan Cui*, 2019 WL 4573226, at *6 n.8—even though the New York common law test for determining who is an employer "focuses more on the degree of control exercised by the purported employer" over the purported employee, rather than the "economic reality of the situation," the primary consideration in the FLSA context, *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013).  The Court thus considers caselaw for both standards.  *See Weng v. New Shanghai Deluxe Corp.*, No. 19 Civ. 9596 (ER), 2022 WL 5434997, at *4 (S.D.N.Y. Oct. 7, 2022)

("[C]ourts in this district have applied the same tests to determine whether an individual constitutes an employer under the FLSA and the NYLL.").

The New York Court of Appeals has explained that "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 802 N.E.2d 1090, 1092-93 (2003); *see also E. Coast Indus., Inc. v. Becconsall*, 301 N.Y.S.2d 778, 779-80 (N.Y. Dist. Ct. 1969) (evaluating the degree of control by looking to the employer's authority to decide the timing and selection of each job and the employer's right to discharge or fire the employee). And "[w]here New York courts have found purely incidental indicia of control, they have found no employee[-employer] relationship." *Hart*, 967 F. Supp. 2d at 926.

Under the "economic reality" test, which is similarly focused on "control," a court considers "whether the purported employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) (quoting *Bonnette v. Calif. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)). To that end, "[o]fficers and owners of corporations may be deemed employers under the FLSA where the individual has overall operational control of the corporation, possesses an ownership in it, controls significant functions of the business, or determines the employees' salaries and makes hiring decisions." *Weng*, 2022 WL 5434997, at *5 (internal quotation marks omitted).

Wei was plainly Gao's employer at Savour Sichuan. Wei hired Gao, set Gao's cashier and server schedules, determined and disbursed her pay, and ultimately fired Gao. Tr. at 48:23-24, 49:3-6, 56:23-24, 75:7-9, 210:9-16.

Hong also qualifies as Gao's employer. To be sure, the evidence did not establish that Hong interacted with Gao (or with any "front-of-the-house" workers, for that matter) in any capacity. *See, e.g.*, *id.* at 74:1-75:3 (Gao testifying only as to her observations of Hong and his management of the kitchen staff). But for an individual to qualify as an "employer," he need not be responsible for directly managing the plaintiff employee himself. *Irizarry v. Catsmitadis*, 722 F.3d 99, 110 (2d Cir. 2013). Nor must he have "directly come into contact" with that employee, her workplace, or her schedule. *Id.* (explaining that nothing in the FLSA "requires an individual to have been personally complicit in FLSA violations"). He need only possess sufficient "control over a company's actual operations in a manner that relates to a plaintiff's employment." *Id.* at 109 (internal quotations omitted). During the relevant period, Hong was undisputedly one of Savour Sichuan, Inc.'s owners and the corporation's President. *See* Exh. 7; Tr. at 293:20-22. Moreover, as Savour Sichuan's head chef, he oversaw the daily operations of the "back of the house workers," and he had the authority to both hire and fire these employees. Tr. at 211:2-24, 293:6-16. Accordingly, the Court concludes that Hong possessed and exercised the requisite control to qualify as an "employer" under the NYLL.

Duan, however, lacked the requisite control over the daily operations of Savour Sichuan for employer status. It is true that Duan, like Hong, was an owner and corporate officer of Savour Sichuan, Inc. during the relevant period. Exhs. 6, 7. But mere "[o]wnership, or a stake in a company, is insufficient to establish that an individual is an 'employer' without some involvement in the company's employment of the employees." *Irizarry*, 722 F.3d at 111. Duan was not

involved in any of Wei's or Hong's managerial decisions, and, in fact, was completely detached from the daily operations of the restaurant.  Tr. at 208:12-20, 210:17-19, 266:8-10.  Lacking even the most incidental indicia of control over any employees at Savour Sichuan, Duan cannot be considered an "employer" under the NYLL.  The Court thus dismisses all claims against Duan.

### 2.  Successor Liability of The Best Sichuan, Inc. and Fang

Next, Gao attempts to hold The Best Sichuan, Inc., and its sole owner Fang, liable on successor liability grounds.  Defendants argue that successor liability has not been established because Gao "has failed to show a sufficiently plausible continuity in course of events, to justify giving her money, in addition to money to her lawyers," with respect to her claims against The Best Sichuan, Inc. and Fang.  Defts. Proposals at 9-11.

As a general matter, "[u]nder both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities."  *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (Sotomayor, J.).  New York recognizes four common law exceptions to this rule of non-liability which apply to: "(1) a buyer who formally assumes a seller's debts; (2) transactions undertaken to defraud creditors; (3) a buyer who *de facto* merged with a seller; and (4) a buyer that is a mere continuation of a seller."  *Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 45 (2d Cir. 2003).  "[T]he party advocating for successor liability bears the burden of proof."  *Xue Ming Wang v. Abumi Sushi Inc.*, 262 F. Supp. 3d 81, 92 (S.D.N.Y. 2017) (citations omitted).

Here, Gao urges successor liability under only the federal "substantial continuity" test and makes no corresponding arguments under the New York standard.  Gao Proposals at 20-21.  Yet, as discussed at *supra* IV.A, the Court has dismissed all of Gao's federal claims.  *See Xue Ming Wang*, 262 F. Supp. 3d at 88 ("[T]he Court is aware of no basis to apply the federal common-law

doctrine discussed below [*i.e.*, the 'substantial continuity' test] to claims arising under state law."). Given Gao's focus on the continuity of management personnel between the two restaurants (and the clear inapplicability of the first two exceptions under common law), *see* Gao Proposals at 21, the Court assesses Gao's arguments under the latter two common law exceptions.

The "*de facto* merger" exception and the "mere continuation" exception are "so similar that they may be considered a single exception." *Cargo Partner*, 352 F.3d at 45 n.3 (citing cases). To determine whether a transaction is a *de facto* merger or mere continuation, courts consider whether there was "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *Nat'l Serv. Indus.*, 460 F.3d at 209.  While a court examines all of those factors, because "continuity of ownership is the essence of a merger . . . , the doctrine of *de facto* merger cannot apply in its absence." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 505-06 (2d Cir. 2011) (per curiam) (citation and internal quotation marks omitted).

Gao's successor liability theory fails out of the gate.  First, the "mere continuation" and "*de facto* merger" theories for successor liability presuppose an inter-corporate asset transfer.  *See Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998) ("Under the common law mere continuation theory, successor liability attaches when the plaintiff demonstrates the existence of a single corporation *after the transfer of assets*, with an identity of stock, stockholders, and directors between the successor and predecessor corporations." (internal quotation marks omitted and emphasis added)).  Indeed, the exceptions expressly refer to a *buyer* and a *seller*.  But there simply is no evidence of an asset transfer, a sale, or any privity at all between Savour Sichuan, Inc. and

The Best Sichuan, Inc. *See Carreiro v. Rhodes Gill & Co., Ltd.*, 68 F.3d 1443, 1448-49 (1st Cir. 1995) (in interpreting common law test under Rhode Island law, finding the "mere continuation" and "de facto merger" doctrines inapplicable in the absence of any evidence of an inter-corporate asset transfer); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) (in applying common law test under Oklahoma law, finding no basis to impose liability under "mere continuation" exception without a transfer of assets); *cf. Whitmore v. O'Connor Mgmt., Inc.*, 156 F.3d 796, 799 (8th Cir. 1998) (holding that the plaintiff's theory based on successor liability principles was flawed because "there was no sale of a business creating a predecessor-successor relation between the two corporations"); *Korlin v. Chartwell Health Care, Inc.*, 128 F. Supp. 2d 609, 614 (E.D. Mo. 2001) (in discussing federal common law theory of successor liability in context of employment discrimination law, explaining that "some type of sale, merger, or consolidation" is "a vital requirement").

Second, even setting aside that fatal flaw in her argument, Gao has failed to show the requisite "continuity in ownership" between the two corporations. There is no dispute that Savour Sichuan, Inc. was owned by Hong, Duan, and Zhang (and between February 2018 and June 2018, by Wei), and that The Best Sichuan, Inc. is owned only by Fang.

Accordingly, the "*de facto* merger" and "mere continuation" exceptions do not apply, and The Best Sichuan, Inc. is not liable for any liabilities incurred by Savour Sichuan, Inc. *See Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 401 (S.D.N.Y. 2012) ("Here, there is no dispute that ownership of the business changed hands; thus, regardless of whether the other *de facto* merger factors are present, the *de facto* merger and 'mere continuation' exceptions do not apply."). The Court therefore dismisses all claims as to The Best Sichuan, Inc. and Fang, and proceeds to

consider Gao's claims only as to Savour Sichuan, Inc., Wei, and Hong, to whom the Court collectively will refer to as Gao's "employers" for the remainder of this decision.

### D.  Minimum Wage

The NYLL guarantees compensation for all work engaged in by covered employees. *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 496, (S.D.N.Y. 2017).  In particular, an employee must be paid at least the minimum wage.  N.Y. Lab. Law § 652(1).  Because Savour Sichuan, Inc. employed eleven or more employees at all relevant times in New York City, *see supra* III.A, it is a "large employer" for the purposes of the NYLL.  *See* N.Y. Lab. Law § 652(1)(a). For such employers, the minimum wage on or after December 31, 2017 was $13.00 per hour, and the minimum wage on or after December 31, 2018 was $15.00 per hour.  *Id.*

Gao asserts minimum wage claims predicated on her employers' purported failure to: (1) compensate her for time she worked as a cashier and as a server after her scheduled shifts and during her scheduled breaks and (2) comply with the tip credit notice requirement before availing themselves of the tip credit in determining Gao's regular rate of pay for her server work.

#### 1.  Compensation for All Hours Worked

An employee seeking unpaid wages under the NYLL must prove that she performed the work and was not compensated properly for her time.  *See Grochowski v. Phoenix Constr.*, 318 F.3d 80, 87 (2d Cir. 2003) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).  The nature of her burden, however, depends on whether her employer met its recordkeeping obligations.

Under the NYLL, "[w]here an employer fails to maintain accurate and complete records of the hours employees work and the amounts they are paid, the plaintiff-employee need only to submit sufficient evidence" from which the alleged violations and resultant damages may be "reasonably inferred."  *See Gonzalez v. Masters Health Food Serv. Inc.*, No. 14 Civ. 7603 (VEC),

2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017) (describing burden-shifting framework under the FLSA and explaining that a "similar standard applies to unpaid compensation claims under [the] NYLL"); *see also* N.Y. Lab. Law § 196-a(a). The employee's burden in these circumstances "is not high and may be met through estimates based on [the plaintiff's] own recollection." *Gamero*, 272 F. Supp. 3d at 497 (internal quotation marks omitted). If the plaintiff makes this showing, the burden then shifts to the employer to prove that the employee was in fact paid the appropriate "wages, benefits and wage supplements." *See Liu v. Little Saigon Cuisine Inc.*, No. 18 Civ. 2181 (RPK), 2021 WL 4487839, at *9 (E.D.N.Y. Sept. 30, 2021) (citing N.Y. Lab. Law § 196-a(a)). "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may be only approximate." *Gonzalez*, 2017 WL 3835960, at *16 (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011)).

Here, the trial evidence showed that Wei maintained records of Gao's server and cashier shifts, the scheduled hours of work based on those shifts, and Gao's pay based on those scheduled hours. *See* Exhs. 1, 2, 3. But Wei offered no evidence of any "time-in and time-out records" showing when workers, actually "arrived, when they started taking their break, when they stop[ped], and when they le[ft]." Tr. at 237:10-13.[12] And, as discussed at *supra* III.D, Defendants did not rebut Gao's testimony on the nature of her breaks and any post-shift work time.

---

[12] Wei testified that she maintained these time-in and time-out records, but that they were destroyed after the fire. Tr. at 241:8-24. But the reason for her inability to produce these records is immaterial. *Cf. Galvez v. 800 Ginza Sushi Inc.*, No. 19 Civ. 8549 (JPC), 2022 WL 748286, at *8 (S.D.N.Y. Mar. 11, 2022) (applying the burden-shifting framework, even though the defendants claimed that the relevant records had been lost inadvertently, because an "unintentional . . . loss of records is not a defense to a record keeping violation" (quoting *Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1246 (D. Or. 2014))); *see also Hulger v. Legend of Asia, LLC*, No. 16 Civ. 549 (DGK), 2017 WL 2703577, at *5 (E.D. Mo. Jun. 22, 2017) ("[T]he Court is unable to find . . . any authority that grants an excuse to the recordkeeping requirement [under the FLSA] for destroyed records.").

Accordingly, the Court need only assess whether Gao has offered "sufficient evidence" from which it can reasonably infer that Gao's employers failed to compensate her for time outside of her scheduled work hours.

### a. Cashier Hours

The Court turns first to Gao's claims for unpaid cashier wages.  Gao worked fourteen cashier shifts between October 28, 2018 and December 16, 2018.  *See supra* III.D.2.  Each of these shifts spanned 11.5 hours with an intended ninety-minute break, and she was compensated for ten hours of work per shift at the statutory minimum wage of $13.00 per hour.  Tr. at 60:22-61:6, 150:21-151:3; Exh. 2.  But Gao stayed for an average of fifteen additional minutes past the scheduled end time of each shift waiting to close out customers.  Tr. at 60:23-61:3.  In addition, Gao was required to keep the restaurant's phone with her during her ninety-minute breaks to process any takeout orders that came in.  *Id.* at 61:20-62:1.  She was required to process such orders during her break period two or three times per week, *id.* at 61:14-62:1, and, as discussed, she worked only one or two cashier shifts per week during this period, *see supra* III.D.2.  The question for the Court is whether this additional time was compensable.

The NYLL incorporates the FLSA's standards for determining whether time worked is compensable.  *Perkins v. Bronx Lebanon Hosp. Ctr.*, No. 14 Civ. 1681 (JCF), 2016 WL 6462117, at *3 n.6 (S.D.N.Y. Oct. 31, 2016).  Under both laws, "all of the time worked during a continuous workday is compensable, save for *bona fide* meal breaks."  *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 475 n.15 (S.D.N.Y. 2014).  "For a break to so qualify, the employee 'must be completely relieved from duty for the purposes of eating regular meals.'"  *Hernandez v. Jrpac Inc.*, No. 14 Civ. 4176 (PAE), 2016 WL 3248493, at *27 (S.D.N.Y. June 9, 2016) (quoting 29 C.F.R. § 785.19(a)).  "That standard is not met if the employee is required to be on-call to handle whatever work arises during the lunch break."  *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 116 (2d

41

Cir. 2023); *cf. Alonso v. 144 Ninth Gotham Pizza, Inc.*, No. 12 Civ. 3133 (DLC), Nos. 14  Civ

4563 (DLC), 15 Civ. 4069 (DLC), 15 Civ. 10062 (DLC), 2016 WL 4257526 at *3 (S.D.N.Y. Aug.

10, 2016)  ("There was no evidence that any plaintiff was given a 'bona fide meal period,' or any

notice that there would be a period of time each day, whether thirty minutes or something else,

when they were *not on call* to perform work for Gotham Pizza." (emphasis added)).  Employees

need not "quantify how many minutes were spent during any given lunch break actually attending

to customers in order to demonstrate that their lunch break" was not a *bona fide* break.  *Herrera*,

84 F.4th at 116.

Moreover, time spent working before and after scheduled shifts is compensable if the duties

"are 'an integral and indispensable part of the principal activities for which covered workmen are

employed,'" and that "the amount of theoretically compensable work . . . is so negligible as to be

*de minimis* and therefore not compensable under the FLSA." *Reich v. New York City Transit Auth.*,

45 F.3d 646, 650, 652 (2d Cir. 1995) (quoting *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)); *see*

*Singh v. City of New York*, 524 F.3d 361, 371 n.8 (2d Cir. 2008) (explaining that "the law of this

circuit—at least since *New York City Transit Authority*—is that a *de minimis* principal activity

does not trigger the continuous workday rule").  Such work is more likely to be found compensable

the more it is "undertaken for the employer's benefit, the more indispensable it is to the primary

goal of the employee's work, and the less choice the employee has in the matter." *New York City*

*Transit Auth.*, 45 F.3d at 650.  In determining whether the time performing such work should

nonetheless be excluded from compensation as *de minimis*, the Court examines: "(1) the practical

administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate;

and (3) whether the claimants performed the work on a regular basis." *Id.* at 652 (internal quotation

marks omitted).

Here, Gao was required to be on call the entire duration of every one of her scheduled lunch breaks, and her breaks were regularly interrupted so that she could process takeout orders.  Tr. at 60:23-62:1.  Because she was not "completely relieved from duty," these breaks did not qualify as non-compensable *bona fide* meal breaks, and Gao is entitled to backpay for twenty-one additional hours of work time (fourteen total cashier shifts times 1.5 hours per shift), resulting in $273 of unpaid wages due (twenty-one uncompensated hours times $13.00 per hour).

As for the average fifteen minutes Gao spent after each of her cashier shifts, the Court finds that such work was also compensable.  As the Court found at *supra* III.D.2, Gao was required to stay past the scheduled end of her shift to close out customers, who presumably had lingered after the restaurant's closing hours.  *See* Tr. at 60:23-61:3.  That work was plainly integral and indispensable to her cashier duties.  Although, in the aggregate, Gao's post-shift work time is not significant because she worked only fourteen cashier shifts, it would not have been difficult to calculate that added time, particularly since she worked that additional time regularly (in fact, she did so for every cashier shift).  The Court thus concludes that this time is not excludable as *de minimis*, and that Gao is entitled to backpay for an additional 3.5 hours for her cashier work (fourteen total cashier shifts times 0.25 hours per shift), resulting in $45.50 of unpaid wages due (3.5 hours times $13.00 per hour).

### b.  Server Hours

Gao also argues that she is entitled to backpay for the hours of her breaks during her server shifts, as well as for her time at the restaurant following the end of her server shifts.  But, unlike her proof concerning the cashier shifts, Gao failed to offer "sufficient evidence" for her claims for any unpaid server wages.

First, she offered only vague testimony on when her meal breaks as a server were interrupted.  At trial, she testified, "I didn't say I didn't take any time off, any break time at all.

There were times that we were so busy I didn't take my break time[,] but I didn't say I didn't take any break." Tr. at 89:23-25. As the Court explained at *supra* III.D.1, the Court is unable to draw any factual findings regarding interruptions to her lunch breaks for her server shifts from such underdeveloped testimony, and so concludes that Gao has failed to meet her burden on this aspect of her unpaid server wages claim. *See Lundy v. Catholic Health System of Long Island, Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) (explaining that the plaintiff's allegations that her thirty-minute meal breaks were "*typically* missed or interrupted" amounted to mere "invited speculation" that "does not amount to a plausible claim under FLSA" (emphasis added)).

Next, although she offered precise testimony on the frequency with which she stayed past her scheduled server shifts, as well as how long she stayed at the restaurant at every shift, Gao offered *no* testimony on why she stayed after those shifts ended or what she did during that time. *See* Tr. at 47:18-24 (Gao testifying that an employee might "get off as late as 5 to 10 to 20 minutes" after the scheduled end of a middle shift and providing no further context on how that extra time was spent); *id.* at 52:24-53:1 (Gao testifying that she left twenty to thirty minutes after the end of the late shift and again providing no further details on how that time was spent). There must be some evidence of what Gao did at the restaurant at the time after her shifts ended for the Court to determine whether she has shown that the time is compensable. *Cf. New York City Transit Auth.*, 45 F.3d at 650 ("The more the preliminary (or postliminary) activity is undertaken for the employer's benefit, the more indispensable it is to the primary goal of the employee's work, and the less choice the employee has in the matter, the more likely such work will be found to be compensable."). Because the Court cannot assess whether Gao's post-shift time was compensable—*i.e.*, whether it was integral and indispensable to performance of the job and not *de*

*minimis*, *id.* at 650-53—Gao has failed to meet her burden on this aspect of her unpaid server wages claim as well.

### 2. Tip Credit Notice

Finally, Gao brings an unpaid minimum wage claim based on her employers' failure to provide her with notice of a tip credit.  Under the NYLL, an employer may credit some amount of the employee's tips against the minimum wage and pay the employee a lower wage than otherwise required, so long as the employee has received notice of tip credit in compliance with the implementing regulations of the NYLL.  12 N.Y.C.R.R. § 146-2.2(a).  The employer bears the burden of demonstrating its compliance with the notice requirement, *Villanueva v. 179 Third Ave. Rest Inc.*, 500 F. Supp. 3d 219, 234 (S.D.N.Y. 2020), which provides: "Prior to the start of employment, an employer shall give each employee written notice of the employee's regular hourly pay rate, overtime hourly pay rate, the amount of tip credit, if any, to be taken from the basic minimum hourly rate, and the regular payday."  12 N.Y.C.R.R. § 146-2.2(a).  This notice must be provided in English and the employees' primary language, and the employer must maintain acknowledgement of receipt of such notices, signed by the employee, for six years.  *Id.* § 146-2.2(a) & (c).  "An employer who does not comply with the NYLL's requirements for taking a tip credit is liable for the difference between the full minimum wage rate and what the employee was actually paid."  *Gamero*, 272 F. Supp. 3d at 508 (internal quotation marks omitted).  An employee is entitled to such compensation even if she earned more than the minimum wage with the tips factored in.  *Id.*

At trial, Wei offered no testimonial or documentary evidence that she provided Gao with written notice of the tip credit in compliance with the NYLL.  The only evidence offered at trial concerning the information Gao received in connection with her server pay was the record of her pay statements.  *See* Exh. 3.  And although these pay statements clearly separated Gao's total

wages from her total tips, nowhere did they disclose that the hourly rate of pay listed in the document reflected the statutory minimum wage ($13.00/hour for 2018 and $15.00/hour for 2019) less the maximum tip credit ($4.35/hour for 2018 and $5/hour for 2019).  Exh. 3; Tr. at 226:8-20; *see* 12 N.Y.C.R.R. § 146-2.2(a) (requiring written notice of the amount of the tip credit to be taken from the basic minimum hourly rate).  The Court thus finds that Wei has failed to demonstrate her compliance with the tip credit notice requirement and, as a result, will not apply a tip credit in determining the minimum wages due to Gao.

Because Gao was paid a regular hourly wage of $8.65 in 2018 (more precisely, before December 31, 2018) and $10.00 in 2019 (more precisely, on or after December 31, 2018), *see* Exh. 3, each below the minimum wage at the time, Gao is entitled to backpay for 387 of the hours she worked as server in 2018[13] and the 54 hours she worked in 2019.  The total wages due come out to $1,953.45 [(387 hours times $4.35 per hour (the minimum wage of $13.00 per hour minus the $8.65 per hour Gao was paid in 2018)) plus (54 hours times $5.00 per hour (the minimum wage of $15.00 per hour minus the $10.00 per hour Gao was paid in 2019))].

## E.     Overtime

Under the NYLL, employers must pay employees "for overtime at a wage rate of one and one-half times the employee's regular rate" for hours worked above forty hours a week.  12 N.Y.C.R.R. § 142-2.2.  As relevant here, in 2018, the overtime rate for non-tipped employees working in New York City for a large employer was $19.50 per hour. *See* N.Y. Lab. Law

---

[13] Gao worked a total of 393 hours as a server in 2018, but she was compensated at a rate of $8.65 per hour for only 387 of those hours.  As discussed at *supra* III.D.1, during the week of December 17, 2018 to December 23, 2018, Gao worked forty-six hours as a server.  For six of those hours, she was compensated at a rate of $12.98 per hour—a rate Wei mistakenly believed represented the appropriate overtime wage for tipped workers. *See* Exh. 3; Tr. at 221:24-222:5, 223:3-4.  The Court addresses the pay due to Gao for those six hours in discussing Gao's unpaid overtime pay at *infra* IV.E, and so excludes those six hours from the instant calculation.

§ 652(1)(a); 12 N.Y.C.R.R. § 146-1.4.   For tipped workers, the overtime rate equals "the employee's regular rate of pay before subtracting any tip credit, multiplied by 1 1/2, minus the tip credit." 12 N.Y.C.R.R. § 146-1.4.   Because the Court has found that Gao's employers could not avail themselves of the tip credit, Gao is also entitled to an overtime rate of $19.50 for the week of December 17, 2018, when her server shifts exceeded the forty-hour threshold. *See supra* III.D.1.

Gao also worked over forty hours for each of the eight weeks in which she worked one or two additional shifts as a cashier, and Wei, under the misunderstanding that Gao's hours for the two assignments should not be considered in the aggregate, failed to pay Gao any overtime during those weeks. *See* Tr. at 234:10-13; *see also supra* III.D.3.   Wei's assumption that Gao's hours need not be aggregated is contrary to the law. *See De Jesus v. Sea Crest Diner-Rest.*, No. 17 Civ. 275 (ADS) (SIL), 2018 WL 3742778, at *5 n.3 (E.D.N.Y. May 7, 2018) ("[T]he employer must total all the hours worked by the employee for him in that workweek (even though two or more unrelated job assignments may have been performed), and pay overtime compensation for each hour worked in excess of the maximum hours applicable under section 7(a) of the Act." (quoting 29 C.F.R. § 778.103)), *report and recommendation adopted by* 2018 WL 6418893 (Dec. 6, 2018); *Paz v. Piedra*, No. 09 Civ. 3977 (LAK) (GWG), 2012 WL 12518495, at *5 (S.D.N.Y. Jan. 12, 2012) ("[C]ourts in this circuit hold that New York Labor Law embodies the same standards for joint employment as the FLSA." (internal quotation marks omitted)), *report and recommendation adopted by* No. 09 Civ. 3977 (LAK) (GWG) (S.D.N.Y. Feb. 1, 2012), Dkt. 133.[14]

---

[14] Defense counsel appears to be under the same legal misconception. *See* Defts. Proposals at 2 ("Plaintiff worked only one (1) time over forty (40) hours in a week.").   The evidence at trial overwhelmingly established that for eight weeks, Gao worked both as a server and as a cashier, and the total hours for each of those weeks exceeded forty. *See id.* ("Plaintiff filled in as a cashier sometimes, and was paid for that.").

For those eight weeks, the Court finds that Gao is entitled to overtime pay at a rate of $19.50 per hour (*i.e.*, the minimum wage due of $13.00 per hour times 1.5) for the time worked—both as a server and as a cashier—that exceeded forty hours.  In calculating the unpaid overtime due, the Court incorporates its conclusion that Gao was entitled to compensation for 1.75 additional hours (1.5 hours of work during her scheduled breaks and 0.25 hours of compensable post-shift work) for each cashier shift she worked.  Accordingly, for those eight weeks, Gao worked the following hours:

- During the week of October 22 to October 28, 2018, Gao worked 47.75 hours (thirty-six server hours and 11.75 cashier hours) and was entitled to overtime pay for 7.75 of those hours.

- During the week of October 29 to November 4, 2018, Gao worked 47.75 hours (thirty-six server hours and 11.75 cashier hours) and was entitled to overtime pay for 7.75 of those hours.

- During the week of November 5 to November 11, 2018, Gao worked 50.5 hours (twenty-seven server hours and 23.50 cashier hours) and was entitled to overtime pay for 10.5 of those hours.

- During the week of November 12 to November 18, 2018, Gao worked 50.5 hours (twenty-seven server hours and 23.50 cashier hours) and was entitled to overtime pay for 10.5 of those hours.

- During the week of November 19 to November 25, 2018, Gao worked 55.5 hours (thirty-two server hours and 23.50 cashier hours) and was entitled to overtime pay for 15.5 of those hours.

- During the week of November 26 to December 2, 2018, Gao worked 50.5 hours (twenty-seven server hours and 23.50 cashier hours) and was entitled to overtime pay for 10.5 of those hours.

- During the week of December 3 to December 9, 2018, Gao worked 59.5 hours (thirty-six server hours and 23.50 cashier hours) and was entitled to overtime pay for 19.5 of those hours.

- During the week of December 10 to December 16, 2018, Gao worked 50.5 hours (twenty-seven server hours and 23.50 cashier hours) and was entitled to overtime pay for 10.5 of those hours.

For the above weeks, Gao was thus entitled to an overtime pay for a total of 92.5 hours at a rate of $19.50, and is owed $601.25 [92.5 hours multiplied by $6.50 per hour (overtime rate of $19.50 per hour minus the $13.00 per hour minimum wage)] for unpaid overtime for those weeks.

As for the week of December 17 to December 23, 2018, which was a week when the Court has found that Gao worked only as a server, *see supra* III.D.2, Gao was paid at an overtime rate of $12.98 per hour for the six hours over forty that she worked. *See* Exh. 3. At trial, Wei explained that she arrived at that figure by first subtracting the tip credit ($13.00 minus $4.35 equals $8.65) and then multiplying that rate by 1.5 ($8.65 times 1.5 equals $12.98). Tr. at 221:24-222:5, 223:3-4. This calculation is an express violation of the NYLL's overtime requirement. 12 N.Y.C.R.R. § 146-1.4 ("It is a violation of the overtime requirement for an employer to subtract the tip credit first and then multiply the reduced rate by one and one half."). In any event, because the tip credit does not apply here, Gao is entitled to overtime payment for those six additional hours at a $19.50 per hour rate. Gao is thus owed an additional $39.12 for the week of December 17 to December

23, 2018 [six hours multiplied by $6.52 per hour (overtime rate of $19.50 per hour minus the $12.98 per hour Gao was paid)].

## F.   Spread of Hours

New York law further requires employers to pay "one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required . . . for any day in which (a) the spread of hours exceeds 10 hours." 12 N.Y.C.R.R. § 142-2.4. "Spread of hours" means "the interval between the beginning and end of an employee's workday." *Id.* § 142-3.16; *see also Leon Neri v. Abi Japanese Rest., Inc.*, No. 20 Civ. 581 (MKB), 2021 WL 6804252, at *9 (E.D.N.Y. Nov. 29, 2021) (explaining that "the spread of hours requirement applies regardless of break time"); *Rodriguez v. Ridge Rest., Inc.*, No. 16 Civ. 254 (DRH) (AKT), 2020 WL 7711859, at *5 (E.D.N.Y. Dec. 29, 2020) (noting that spread of hours includes "working time plus time off for meals plus intervals off duty" (quoting 12 N.Y.C.R.R. § 146-1.6)).

Here, it is undisputed that Gao's full server shifts spanned 10.5 hours, and that her cashier shifts spanned 11.5 hours.[15]  As the Court found, Gao worked forty-nine full shifts as a server and fourteen cashier shifts, and Gao's employer compensated her only for the hours scheduled for each shift. *See supra* III.D.1, 2; *see also* Exhs. 2, 3.  Because Gao was entitled to an additional hour's pay for each of those shifts, the Court finds for Gao on her spread-of-hours claim.  The Court applies the $13.00 minimum wage to the forty-three full server shifts and fourteen cashier shifts that Gao worked before December 31, 2018, and the $15.00 minimum wage to the six full server shifts that Gao worked on or after December 31, 2018.  Accordingly, the Court determines that

---

[15]  In his clients' proposed factual findings, defense counsel maintains that Gao "never worked more than ten (10) hours in any one shift."  Defts. Proposals at 3.  To the extent this is meant to suggest that Gao therefore was not entitled to spread-of-hours pay, that is not the law. As explained above, the spread-of-hours inquiry looks at the interval between the start and end of an employee's workday, without regard to the total number of hours actually worked that day.

Gao is entitled to spread-of-hours pay in the amount of $831—*i.e.*, the sum of (1) fifty-seven shifts times $13.00 per shift and (2) six shifts times $15.00 per shift.

### G.     Wage Statements

Under the NYLL, employers are required to "furnish each employee with a statement with every payment of wages."  N.Y. Lab. Law § 195(3).  These wage statements must include, among other details, the dates of work covered by the payment of wages, rates of pay, gross wages, deductions, and allowances.  *Id.*  The NYLL further provides that employees may be entitled to specified penalty awards for violations of these provisions.  *Id.* § 198(1-b), (1-d).  The Court need not determine whether Gao's employers provided compliant wage statements because Gao lacks standing under Article III of the U.S. Constitution to bring such a claim in the first instance.  *See* Defts. Proposals at 4-9 (arguing that Gao failed to establish an injury-in-fact for purposes of Article III standing for her claims under Sections 195(1) and 195(3) of the NYLL).

"The requirements of Article III standing are well established: '[A] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"  *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  As the party invoking federal jurisdiction, Gao bears the burden of demonstrating standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Following the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), a number of judges in this Circuit have dismissed wage statement (and wage notice) violation claims under the NYLL for lack of Article III standing, where a plaintiff failed to establish an injury traceable to the defendant's purported violation of the wage statement

requirement.  *See, e.g.*, *Ramirez v. Urion Constr. LLC*, No. 22 Civ. 3342 (LGS), 2023 WL 3570639, at *8 (S.D.N.Y. May 19, 2023); *Guthrie v. Rainbow Fencing Inc.*, No. 21 Civ. 5929 (KAM), 2023 WL 2206568, at *6 (E.D.N.Y. Feb. 24, 2023); *Neor v. Acacia Network, Inc.*, No. 22 Civ. 4814 (ER), 2023 WL 1797267, at *4 (S.D.N.Y. Feb. 7, 2023); *Shi v. TL & CG Inc.*, No. 19 Civ. 8502 (SN), 2022 WL 2669156, at *9 (S.D.N.Y. July 11, 2022); *Sevilla v. House of Salads One LLC*, No. 20 Civ. 6072 (PKC), 2022 WL 954740, at *7 (E.D.N.Y. Mar. 30, 2022); *Wang v. XBB, Inc.*, No. 18 Civ. 7341 (PKC), 2022 WL 912592, at *13 (E.D.N.Y. Mar. 29, 2022); *Sanchez v. Ms. Wine Shop Inc.*, 642 F. Supp. 3d 355, 371-73 (E.D.N.Y. 2022).  Indeed, *TransUnion* reemphasized that "bare procedural violation[s] divorced from any concrete harm" do not suffice for Article III standing.  594 U.S. at 440 (quoting *Spokeo*, 578 U.S. at 341).  Rather, a plaintiff seeking redress from a federal court must demonstrate that such a violation resulted either in a tangible harm or an intangible harm "traditionally recognized as providing a basis for lawsuit in American courts."  *Id.*

Some courts in this Circuit have since reasoned that the "informational injury" arising from the failure to receive compliant wage notice or wage statements can give rise to Article III standing, so long as the plaintiff can establish concrete, "downstream consequences" showing "an interest in using the information" outside of bringing the lawsuit.  *Shi*, 2022 WL 2669156, at *8 (quoting *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022)); *accord Chen v. Lilis 200 West 57th Corp.*, No. 19 Civ. 7654 (VEC), 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023) ("In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation.").  For example, some judges have found Article III standing at the pleadings stage where the plaintiff alleges that the employer's

failure to provide compliant wage statements prevented the plaintiff from recognizing that she was being underpaid, resulting in underpayment for a discrete period. *See, e.g.*, *Lipstein v. 20X Hosp. LLC*, No. 22 Civ. 4812 (JLR) (JW), 2023 WL 6124048, at *9-10 (S.D.N.Y. Sept. 19, 2023); *Metcalf v. TransPerfect Translations Int'l, Inc.*, No. 19 Civ. 10104 (ER) (KHP), 2023 WL 2674743, at *6-7 (S.D.N.Y. Mar. 29, 2023); *Mateer v. Peloton Interactive, Inc.*, No. 22 Civ. 740 (LGS), 2022 WL 2751871, at *2 (S.D.N.Y. July 14, 2022).   But others have found similar allegations insufficient to confer Article III standing, reasoning that even if such harm did constitute an "injury in fact," it was not "fairly traceable" to the alleged Section 195(3) violation:

> [W]hat [plaintiff] is really saying is that *if* defendants had given him the required documents, those documents *would have* informed him that he was not being paid his required wages.  Enlightened by that knowledge, plaintiff then *would have* demanded his required wages.  Having made such a demand, defendants *would have* then paid him his required wages, and plaintiff *would have* avoided the injury he suffered by the failure to properly pay him.  This implicit analysis apparently leads to plaintiff's conclusion that he has suffered an actual and concrete injury by reason of his employer's violation of § 195.
>
> This hypothetical chain of events is not what the Supreme Court means by an injury fairly traceable to the allegedly unlawful conduct.

*Quieju v. La Jugeria Inc.*, No. 23 Civ. 264 (BMC), 2023 WL 3073518, at *2 (E.D.N.Y. Apr. 25, 2023) (internal quotation marks omitted); *see Freeland v. Findlay's Tall Timbers Distrib. Ctr., LLC*, No. 22 Civ. 6415 (FPG), 2023 WL 4457911, at *12-14 (W.D.N.Y. July 11, 2023) (adopting reasoning in *Quieju*).

Gao's alleged injury from her employers' purported Section 195(3) violation has metamorphosed several times throughout the course of this litigation.  In her pretrial brief, she asserted that she was injured by her employers' failure to provide compliant wage statements because she did not know her "true salary," and that this informational injury resulted in her underpayment and untimely payment of overtime wages that she could have otherwise used or

invested.  *See* Dkt. 158.  Gao's counsel reiterated this position at the final pretrial conference.  *See* Final PTC Tr. at 16:7-23.  But she abandoned that theory at trial.  In fact, her testimony made clear that she understood precisely how (and how much) her employers were compensating her for her work.  *See, e.g.*, Tr. at 68:8-10 (Gao testifying that she was told she would be paid $130 per day when she worked as a cashier), 68:13-16 (Gao testifying that Wei informed Gao that her base wage rate for her server work rose from $8.65 per hour to $10 per hour), 92:15-17 (Gao referring to Exhibit 3 and testifying that she received these paystubs for her work as a server).

Instead, Gao testified that because her employers failed to provide her with any pay statements for her cashier work, she was unable to report the pay she received on her tax forms. *Id.* at 64:17-19.  And while cross-examining Wei on the pay receipts for Gao's cashier work, Gao's counsel explained that such questioning was "relevant to establishing the financial harm of the paystubs claims because if the paystubs were being used to determine the amount reported on the W-2 . . . and the pay receipts for the cash [were] not, then she [was] filing incorrect tax returns and that exposes her to financial liability to the IRS."  *Id.* at 230:18-23; *see also* Gao Proposals at 18. Then, in her post-trial submission, Gao added yet another theory of her purported financial harm, asserting that her employers' purported failure to provide "paystubs . . . accurately listing (and calculating FICA and withheld income tax on) deprived [Gao] of money in her Social Security account."  Gao Proposals at 28.

As explained at *supra* III.D, the Court discredits Gao's testimony that she was unable to report her income on her tax forms for 2018 and 2019, and so that allegation cannot provide a basis for standing.  As for Gao's latest assertion that her employers deprived her of payments to her Social Security account, the Court initially notes that Gao provided no testimony to that effect. (And indeed, no record citation is provided for that proposition in her post-trial submission.  *See*

Gao Proposals at 18, 28.)  But even setting aside the dispositive lack of any record evidence, Gao's newly proclaimed financial harm does not appear to have any causal relationship with her employers' purported Section 195(3) violation.  Rather, that alleged harm would seem to arise from the employers' pay structure (*i.e.*, their decision to pay Gao in cash for her cashier work without deducting for taxes)—not their failure to provide precise details about this pay structure.  *Cf. Freeland*, 2023 WL 4457911, at *13 (explaining that the plaintiffs' purported harm of being underpaid for a discrete period was "fairly traceable" to the employer's "failure to comply with its obligation to pay [the plaintiff] the correct overtime rate," not the defendant's failure to provide wage statements in compliance with Section 195(3)).

Because Gao has failed to establish standing, the Court dismisses Gao's Section 195(3) claim for lack of jurisdiction.[16]

## H.    Liquidated Damages

Under Section 198(1-a) of the NYLL, an employee prevailing in an action for unpaid wages may recover "an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due" "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law."  The NYLL liquidated damages provision resembles the provision in the FLSA, *compare* N.Y. Lab. Law § 198(1-a) *with* 29 U.S.C. § 260, and courts in this Circuit have not substantively distinguished the federal standard for good faith from the state standard.  *See Luna v. Gon Way Constr., Inc.*, No. 16 Civ. 1411 (ARR) (VMS), 2017 WL 835321, at *13-14 (E.D.N.Y. Feb. 14, 2017), *report and recommendation adopted by* 2017 WL 835174 (Mar. 2, 2017); *Garcia v. Bad Horse Pizza, Inc.*, No. 14 Civ. 8858 (WHP), 2017

---

[16] As noted at *supra* I, Gao has abandoned her claim for failure to provide wage notice in violation of Section 195(1) of the NYLL.  *See generally* Gao Proposals; *see Ortho Pharm.*, 32 F.3d at 697.

WL 192955, at *3 & n.3 (S.D.N.Y. Jan. 18, 2017); *Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 504-05 (S.D.N.Y. 2015).  To demonstrate good faith, an employer must show that it took "active steps to ascertain the dictates of the [NYLL], and then act[ed] to comply with them." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999); *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008); *see also Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987) ("The [good faith] defense requires plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it.").  An employer's ignorance of the law is insufficient to establish good faith for purposes of precluding liquidated damages under this standard.  *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997).

Here, the Court finds that Wei has failed to sustain her burden of demonstrating the requisite good faith.  At trial, Wei gave general and unspecific testimony that her accountant advised her of the non-tipped wage rate and informed her that "as long as [the] base pay and the tip pay total is greater than the minimum," then the restaurant was in compliance with its legal obligations.  Tr. at 227:21-24.  As for her overtime rate calculation, she testified that she used the method that Zhang taught her, and that "an employee from the accounting office mentioned something about [a] 1.675 [multiplier]" for determining overtime rates, but that "because there isn't a lot of OT," she "never actually paid that much using that calculation."  *Id.* at 227:8-11, 228:9-12.

The Court finds that this testimony is insufficient to demonstrate that Gao's employer took "active steps to ascertain the dictates" of the law and then "act[ed] to comply with them."  *Herman*, 172 F.3d at 142.  Rather, Wei's testimony reveals an impermissibly lax approach toward her legal obligations as an employer.  For instance, even though she received conflicting guidance on how

to calculate overtime rates, she took no additional steps to confirm the appropriate calculation; and, indeed, she ultimately applied the method of calculation expressly listed as a violation of the NYLL.  *See* 12 N.Y.C.R.R. § 146-1.4.   Moreover, she appears not to have taken *any* steps to determine whether Gao's cashier and server hours should be aggregated for the purposes of overtime payments and instead relied on her own "point of view" that "because they're two different and separate jobs," such aggregation was unnecessary, Tr. at 234:2-13.   In these circumstances, Gao's employer has not shown the requisite good faith to preclude an award of liquidated damages.  *Cf. Salustio*, 264 F. Supp. 3d at 557 (finding that the defendant, who testified that he had relied on advice from his accountant, failed to meet his burden of demonstrating good faith in part because the defendant's "explanation of his conversation with his accountant was sparse and lacking in detail"); *see also Herman*, 172 F.3d at 142 (explaining that under the FLSA provision, "[t]he employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception" (citation omitted)).

## I.      Pre-Judgment and Post-Judgment Interest

Finally, a plaintiff who prevails on a NYLL wage claim is entitled to pre-judgment interest on any "underpayment" of wages.  *See* N.Y. Lab. Law § 198(1-a); *Santana v. Latino Express Rests., Inc.*, 198 F. Supp. 3d 285, 294 (S.D.N.Y. 2016).  The pre-judgment interest award applies only to the amount of underpayment of wages, not the liquidated damages.  *See Ortega v. JR Primos 2 Rest. Corp.*, No. 15 Civ. 9183 (JCF), 2017 WL 2634172, at *6 (S.D.N.Y. June 16, 2017) ("Prejudgment interest is available on actual damages awarded under the NYLL, but not on liquidated damages." (citing *Xochimitl v. Pita Grill of Hell's Kitchen, Inc.*, No. 14 Civ. 10234 (JGK) (JLC), 2016 WL 4704917, at *18 (S.D.N.Y. Sept. 8, 2016))).  Pre-judgment interest in New

York runs at the rate of nine percent per annum, N.Y. C.P.L.R. §§ 5001(a), 5004(a), from "the earliest ascertainable date the cause of action existed," *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994) (quoting N.Y. C.P.L.R. § 5001(b)).  "Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."  N.Y. C.P.L.R. § 5001(b); *see also Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 91 (2d Cir. 1998).

Here, Gao's claims for unpaid wages arose on different dates from October 8, 2018 to January 9, 2019.  The midpoint of these dates is November 23, 2018.  Accordingly, the Court finds that Gao is entitled to nine percent annual interest on her $3743.32 unpaid wages award from November 23, 2018, until the date judgment is entered, or $0.92 per day ($3743.32 times .09 divided by 365 days).

Gao is also entitled to post-judgment interest on her total award.   Under 28 U.S.C. § 1961(a), "[i]nterest shall be allowed on any money judgment in a civil case recovered in district court."  Courts in this Circuit have accordingly awarded post-judgment interest where a plaintiff is entitled to damages under the NYLL.  *See, e.g.*, *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 53 (E.D.N.Y. 2015); *Begum v. Ariba Disc., Inc.*, No. 12 Civ. 6620 (DLC), 2015 WL 223780, at *8 (S.D.N.Y. Jan. 16, 2015).  Gao is thus awarded post-judgment interest, to be calculated from the date of the entry of judgment in this action until the date of payment, using the federal rate set forth in 28 U.S.C. § 1961.

## V.  Conclusion

For the foregoing reasons, the Court dismisses Plaintiff Xiaochun Gao's claim for unfurnished wage statements for want of jurisdiction, dismisses Gao's claims under the FLSA, finds in favor of Defendants The Best Sichuan, Inc., Xiaoman Duan, and Jie Fang on all remaining

claims, and finds in favor of Gao against Defendants Savour Sichuan, Inc., Dongmei Wei, and Weimin Hong on her claims for unpaid minimum wage, unpaid overtime, and unpaid spread-of-hours pay under the NYLL.  Gao is awarded damages from those Defendants, joint and severable, in the amount of $7,486.64 (calculated as the sum of $3743.32 in compensatory damages and $3743.32 in liquidated damages), plus pre-judgment interest on the $3743.32 in compensatory damages at $0.92 per day starting on November 23, 2018 until the date judgment is entered, and post-judgment interest pursuant to 28 U.S.C. § 1961.  The Clerk of Court is respectfully directed to enter judgment accordingly.

To the extent Gao still intends to seek a default judgment against Defendants Yi Zhang and La Vie En Szechuan Restaurant Corp., she must file such motion by March 8, 2024.  After resolving that default judgment motion, or in the event Gao opts not to move for a default judgment, the Court will set a briefing schedule for Gao's anticipated motion for attorneys' fees and costs.

SO ORDERED.

Dated: February 16, 2024
      New York, New York

_____
JOHN P. CRONAN
United States District Judge